92 482
s52NW1070
f132 ¹ 30
132 ¹110

92 482
135 ¹278

92 482
138 ¹ 66

92 482
j147 ¹221

92 482
150 ¹249

## THE MICHIGAN PIPE COMPANY v. THE MICHIGAN FIRE & MARINE INSURANCE COMPANY.

*Fire insurance—Company's agent acting for applicant—Validity of policy—Payment of premium—Directing verdict—Credibility of witness.*

1. To justify an instruction that a witness has told the truth, and the direction of a verdict based upon the truthfulness of his evidence, there must be nothing in the circumstances or surroundings tending to impeach the witness, or to throw discredit upon his statements; citing *Druse v. Wheeler,* 26 Mich. 195.

2. Where an agent for several insurance companies is directed to place a given amount of insurance, without any expectation on the part of the applicant that it will all be written in any one of the companies, which are not mentioned by name, no contract exists as to any one nor as to all of them, and no liability attaches, until further action is taken to determine and define the risk, in doing which the agent acts as agent for the insured.

3. It would be contrary to the general understanding among business men, and to prevailing methods, to hold that in all cases insurance premiums must be expressly agreed upon and paid, or credit be expressly given therefor, in order to make a valid contract for insurance.

Error to Bay. (Cobb, J.) Argued˚ January 22, 1892. Decided July 28, 1892.

*Assumpsit.* Defendant brings error. Reversed. The facts are stated in the opinions.

*Hanchett, Stark & Hanchett ( Thomas Bates,* of counsel), for appellant, contended:

1. The undisputed facts of the case show that at the time of the fire the insurance provided for in the policies had not been agreed upon between the parties, and the policies did not

create any obligation upon the defendant. The plaintiff was not liable for the premium, because it had not assented to the insurance, and had not agreed to pay the premium upon it; and, the plaintiff not being bound by the policies, the defendant was not liable upon them; citing 1 Wood, Ins. §§ 5, 6; *Manufacturing Co. v. Insurance ˉCo.*, 69 Wis. 573, 574; *Strohn v. Insurance Co.*, 37 Id. 625, 628-630; *Kimball v. Insurance Co.*, 17 Fed. Rep. 625; *Insurance Co. v. Young*, 5 Ins. Law J. 17, 20, 21; *Insurance Co. v. Jenkins*, Id. 514; *Thayer v. Insurance Co.*, 10 Pick. 326, 331; *Tyler v. Insurance Co.*, 4 Rob. (N. Y.) 151; *Wood v. Insurance Co.*, 32 N. Y. 619; *Hartshorn v. Insurance Co.*, 15 Gray, 240, 244.

*Hatch & Cooley*, for plaintiff, contended for the doctrine of the opinion, as stated in head-notes 2 and 3.

GRANT, J. This is an action upon two policies of insurance, dated, respectively, July 2 and 3, 1890, for $2,500 each, upon lumber claimed to have been the property of · the plaintiff, and situated upon two docks in East Tawas, Mich. The property insured was consumed by fire on the night of July 5 following. One J. H. Schmeck was the defendant's agent at East Tawas at this time, and was authorized to—

"Receive proposals for insurance against loss or damage by fire, * * * to fix rates of premium, to receive moneys, and to countersign, issue, renew, and consent to the transfer of policies of insurance, * * * subject to the rules and regulations of the company, and to such instructions as may, from time to time, be given by its officers."

He also was the agent of several other companies. Schmeck's wife was a stockholder of the plaintiff, and his brother-in-law was its secretary and treasurer, and its general office was in Bay City.

One Moulthrop was plaintiff's agent at East Tawas, and testified that he made application to Schmeck on the 26th day of June for insurance. He said: "I told him I wanted $25,000 of insurance on Locke's dock, $18,-000 on Emery's main dock, and $2,000 on the shore."

Nothing was said about the rate of insurance, or the time it was to run, or the companies in which it was to be placed. Schmeck said he would write it right away, and Moulthrop testified that he understood that the insurance was to begin at once, and that such was his intention. Neither Moulthrop, nor any one else, on behalf of the plaintiff, paid any further attention to the insurance until after the fire. The fire occurred Saturday night. On Sunday, July 6, Moulthrop and Smith, the plaintiff's secretary and treasurer, having been notified by telegraph of the fire, went from Bay City to East Tawas, and in the evening saw Schmeck at his house, and asked for the policies. Schmeck said they were locked up in his safe, and he would send them the next day. Mr. Smith received them by mail, July 8. On July 7, Schmeck forwarded to defendant by mail the daily reports of this insurance, and also by letter notified it of the loss. The receipt of these communications on July 9 was the first information defendant received of this alleged insurance.

Aside from the above, the only evidence of the issuance of these policies, or of any contract of insurance, comes from Mr. Schmeck. He testifies that Mr. Moulthrop applied to him for insurance June 26; that these policies were written up and signed by him on the 2d and 3d of July. He did not know when they were "ruled up." Some of the policies were ruled up Monday morning, but he did not know whether these were or not. He signed them before they were ruled up; that was his custom. His instructions required him to make a report of all insurance on the day he received it, but he disregarded these instructions. The daily reports were made out Saturday, the 5th, placed in an envelope, directed, and deposited in the post-office about 7 o'clock that night. Schmeck was postmaster. He went to the post-office about

7 o'clock Monday morning, July 7, changed the post-office stamp back from the 7th to the 5th, and stamped the envelope containing these reports with the stamp so changed. At this time he had not mailed the policies to Mr. Smith. They were not at that hour ready for mailing. They were ruled up after that time by one Sims, his bank clerk. He placed this insurance in 13 companies. On Monday, the 7th, he notified some of these companies by telegram to reinsure the lumber, but did not telegraph the defendant. All the policies were sent to plaintiff at the same time. This is all of his evidence which it is material to mention. The amount of insurance on the lumber upon the Emery dock was written up at $17,500, though the amount ordered was $18,000.

August 18 plaintiff sent a check to Schmeck for the total amount of the premiums upon these policies. Schmeck replied to this communication that he placed $125 of this amount to the credit of plaintiff's account, subject to its order, because he had been instructed by the defendant not to receive any premium from the plaintiff. Schmeck's agency for the defendant was terminated July 9. Plaintiff did not withdraw this money from Schmeck, and made no further offer of payment for the premium. Smith, plaintiff's secretary, testified that at the time he sent the check he did not know that Schmeck's agency had been terminated.

Plaintiff also gave evidence showing that G. P. and H. B. Smith, who were the plaintiff's managers, had also been managers for two other lumber companies doing business at East Tawas, and that as such they had obtained large insurance through Schmeck; that their custom had been to take such insurance for a year; that there had been a uniform rate for lumber on these docks, though plaintiff did not know what it was; that they generally left their policies in Schmeck's hands until

they got through sawing; that the policies were canceled as fast as the lumber was shipped, and that the premiums were paid whenever Mr. Schmeck sent his bill. This testimony was received under objection. Plaintiff had had no dealings with the defendant prior to the insurance here involved. Mr. Moulthrop also testified that the rate of insurance depended upon the exposure; that the different piles upon the mill docks were subject to different exposures; and that the rate would be higher on one lot of lumber on one dock than on another.

Plaintiff had sold a part of the lumber on Emery's main dock to E. & B. Holmes. The contract was in writing, and is as follows:

"Sold E. & B. Holmes all the lumber to be cut from 6 I. N logs now in Emery Bros.' boom, being from 2 to 2½ millions feet, at $10 for shipping culls, $20 for common, $37 for uppers, and mill culls, $6. We to sort out coarse top logs, being from 15 to 20 per cent. Said lumber to be the first sawing in the spring, which is expected to commence April 1, if so, and be finished by May 1. They to give us their paper for $20,000, to come due between September 1 and October 15, averaging the time. Balance of lumber to be paid for by 60-day paper from shipment. If any more time is wanted, they to have it by paying interest. We to insure lumber payable to E. & B. Holmes, as their interest may appear."

This contract did not provide for inspection, but it was agreed that one Chamberlain should inspect the lumber when shipped, and that the expense should be borne equally between them. Early in June all the Holmes lumber had been sawed, and piled upon the dock, separate from all other lumber, and marked with the log mark, and three vessel loads had been shipped under the direction of the Holmes. The notes for $20,000 had been given. The vendees were at liberty to ship it at any time they chose, and were to pay for loading it.

In May previous to the fire Mr. Henry B. Smith, on behalf of the plaintiff, made a contract with one Hazard for the sale of 1,000,000 feet of lumber. This contract rested in parol. Mr. Smith testified in regard to it as follows:

"The bargain was closed up in the early part of May. Hazard was to take 1,000,000 or more feet of lumber, at $21 straight, except the mill culls; $6 was the price fixed on the mill culls. This lumber was sawed out during the early part of the year, up to the first of June. After the close of the bargain with Hazard, about one-third of the lumber had yet to be sawed. Mr. Chamberlain was to inspect it. In the course of the business the inspecting, measuring, and scaling of the lumber was to take place probably along in June, the scaling to be done when the lumber was shipped. Each cargo would be scaled as it would be put on the vessel."

Mr. Moulthrop testified in regard to this lumber:

"At the time of the fire the amount of lumber on the Locke & Stephens dock was 1,851,735 feet. Of that, from 530,000 to 540,000 feet had been sold to C. P. Hazard, and stood in piles by itself on the dock ready for shipment, marked up to Hazard. It was marked, 'Sold to C. P. H.' The balance of the lumber sold to Hazard had been shipped."

Again, he testified as follows:

"I put this mark on the lumber piles by no one's direction, to distinguish that lumber from other lumber. No one representing Hazard was present when I put the mark on. They were put on for my own convenience. This lumber sold to Hazard was a part of a large mass of lumber, so that, before he could get at what was coming to him, it had to be separated from the remainder. As to the marking of the piles, it is customary to do that to distinguish lumber from other lumber, so that anybody can readily see what lumber it is.      *      *      * In order to determine what he was to pay for each shipment, it would have to be measured and inspected, in order to separate the better lumber from the mill culls, and to determine the amount."

The policies were to run one year from the 2d and 3d days of July, at noon, and covered—

"Lumber, lath, and shingles owned by the insured, or held in trust or on commission, or sold, but not delivered, piled on the docks of Temple Emery and of Locke & Stevens."

The above full statement of the evidence is necessary to an understanding and determination of the questions raised. The defendant introduced no evidence, and the court directed a verdict for the plaintiff.

1. I do not think the court was justified in instructing the jury that the facts were undisputed, and that the policies in question were issued on July 2 and 3. Whether these policies were issued before the fire was known only to Mr. Schmeck, and that question must be determined from his evidence alone. To justify a court in instructing a jury that a witness has told the truth, and in directing a verdict based upon the truthfulness of his evidence, there must be nothing in the circumstances or surroundings tending to impeach the witness, or to throw discredit upon his statements. If there is anything tending to create distrust in his truthfulness, the question must be left to the jury. *Druse v. Wheeler*, 26 Mich. 195. Mr. Schmeck's conduct is not free from suspicion. It was inconsistent, not only with good business principles and methods, but with honesty and fair dealing. After the fire he says that he telegraphed some of the companies to reinsure. He thereby attempted to accomplish a fraud. He changed the post-office stamp, and when the fire occurred, July 5, he took no steps to notify the defendant until the 7th, knowing that in due course of mail it could not be reached until the 8th or 9th, and that it knew nothing of this insurance. He did not produce the policies when plaintiff asked for them. According to his own story, they were not then ready to be delivered.

He had one or more clerks in his office, one of whom completed some of the policies on the 7th, yet no one, except himself, is known to have seen the policies before the fire, or any record or memorandum of the insurance. His wife and brother-in-law were interested. He violated his instructions in not reporting the insurance on the day it was made. The telegraph offices were open on Sunday, and Schmeck received notice of the fire early that morning, but he did not telegraph the loss to the defendant at Detroit. Under such a record, the question was one of fact for the jury, and not for the court. It was competent for the defendant to show that Schmeck's instructions were to telegraph to it any loss that might occur, and this evidence was improperly excluded. The jury would have the right to consider that fact in determining when the policies were issued.

2. Had the validity of this insurance depended upon the title in plaintiff, it could not recover for the lumber sold to E. & B. Holmes, for under this record the title had passed. But the terms of the policies did not limit them to such property; they covered as well property held by it in trust, or sold, but not delivered, and piled on the docks in question. In construing the meaning of the word "delivered," the facts, as they were known to the insured and the insurer, must be considered. The property was all piled upon the docks at the time the policies were issued. Its speedy removal by vessel was contemplated. The term cannot, therefore, be construed in this case in a technical legal sense. It is clear, in my judgment, that the parties understood the term to mean removal from the docks where it was situated. The plaintiff's agents must have so understood it, and the defendant's agent was familiar with the method of doing business at that point. The ruling of the court upon this point was correct.

3. The most important question in the case is whether a mutual and valid contract for insurance was consummated before the fire, binding both the plaintiff and defendant. In order to complete a contract for insurance, the minds of the parties must meet and agree to five things: (1) The subject-matter to which the policy is to attach; (2) the risk insured against; (3) the duration of the risk; (4) the amount of indemnity; and (5) the premium to be paid, which must be paid at the time of the contract, or exist as a valid legal charge against the insured. 1 Wood. Ins. § 5. If either of these is wanting, no contract has been consummated. Id. § 6. The claim of the defendant is summarized as follows:

1. The name of no one company had been agreed upon.

2. The location of the risk for no one company had been fixed.

3. The amount of the risk which defendant should carry had not been agreed upon.

4. The rate of premium had not been discussed or agreed upon.

5. No date had been fixed for the commencement and termination of the risk.

6. No premium was paid, nor was there any agreement to give credit for it.

Plaintiff's counsel state their position as follows:

"Where a person applies to an insurance agent for insurance, nothing being agreed upon but the property to be insured and the amount, and the agent fills out a policy wherein he specifies. rate, time when risk begins, the time it has to run, and other particulars necessary to a complete contract of insurance, the insured may, after the fire, ratify the action of the agent, and thus. consummate the contract."

"When the insured has been in the habit of leaving his policies with the agent who issued them, that will not prevent them from being regarded as delivered."

"The fact that the particular companies who should issue the policies were not agreed upon between the agent

and the applicant will not affect the validity of the policy when it is actually issued."

"Want of knowledge on the part of the insured of the existence of the policy will not affect its validity when held by the agent for him."

"The fact that no rate of premium had been agreed upon before the making of the policy will not of itself invalidate it."

Arguing from these propositions, they insist that because before the fire plaintiff had applied to Schmeck for insurance, and he had agreed to write it, and had actually filled out and signed the policies, and had afterwards delivered them to plaintiff, which accepted and ratified them, the policies are valid and binding as written.

It is well settled that, where a contract of insurance has been agreed upon, no policy need be made out, or, if made out, its delivery is not essential to the validity of the contract. If in such case loss occurs, the insured may bring suit upon the agreement, or file a bill for the specific performance of the contract. *Insurance Co. v. Colt*, 20 Wall. 560; *Tayloe v. Insurance Co.*, 9 How. 390; *Lightbody v. Insurance Co.*, 23 Wend. 18, 25; *City of Davenport v. Insurance Co.*, 17 Iowa, 276, 285.

When one applies for insurance, the insurer must accept the terms of the application before a contract can exist. If the insurer replies to the application by proposing different terms, or by sending a policy differing in essential matters from the application, no contract has been made until the counter-proposition or policy has been accepted by the applicant. The same rule applies to contracts for insurance as to other contracts. If plaintiff had sent a proposition to A. to sell him 1,000,000 feet of lumber, then piled upon the dock, for $20 per thousand for uppers and $6 per thousand for culls, and providing when and how payment should be

made, and that the title should pass upon the execution of the contract by him, and requesting him to execute a contract in accordance with the terms proposed, and A. should return a paper signed by him for the purchase of 950,000 feet, or for the purchase of the whole at $19.95 per thousand, it is evident that no contract would exist until the paper signed by A. had been received and accepted by it. If such lumber should be destroyed by fire before A.'s proposition was received and accepted, the loss would fall on plaintiff, for the minds of the parties would not then have met, and the title would remain in plaintiff.

Plaintiff had no contract with the defendant until the policies were written out and signed, and were in accordance with the terms of the application. If defendant had not made out and signed the policies, plaintiff could have no standing, because its agent had made no agreement to place any of the insurance applied for in the defendant company. Plaintiff, at the time of its application, made no contract with Schmeck, binding upon any of the companies for which he was agent. The name of no company was mentioned, much less agreed upon. Granting that it was understood when the insurance was effected that the rates were to be the usual ones, still the policies differed in two essential particulars from the application, viz., the amount, and the time from which they were to run. By the application, the insurance was to commence June 26. One of the policies commenced July 2, and the other July 3. The amount was $500 less than the amount agreed upon when the application was made. If Schmeck could have written policies 6 days after, which would bind the parties, with time to begin to run on the day they were written, he could as well have written them 30 days, or any other time, after, with similar provisions as to time. He could also have written them on June 26, and

provided for the time to run from July 2 and 3. If he could reduce the amount ordered or agreed upon by $500, he could as well have reduced it by $10,000 or $20,000. It is not the extent of the difference that controls, but the fact that there is any material difference between the terms of the application or the parol agreement and the terms of the policy. If before these policies were issued the lumber had all been removed, the law would certainly have justified plaintiff in saying to defendant, when the premiums were demanded: "The insurance is not such as I ordered, and I received no benefit from it." It is clear, in my judgment, that no valid contract of insurance existed between these parties at the time of the fire. I think the following authorities sustain this conclusion: *Mattoon Manfg. Co. v. Insurance Co.*, 69 Wis. 573 (35 N. W. Rep. 12); *Kimball v. Insurance Co.*, 17 Fed. Rep. 625; *Insurance Co. v. Young*, 5 Ins. Law J. 17; *Insurance Co. v. Jenkins*, Id. 514; *Thayer v. Insurance Co.*, 10 Pick. 326; *Tyler v. Insurance Co.*, 4 Rob. (N. Y.) 151; *Strohn v. Insurance Co.*, 37 Wis. 625; *Wood v. Insurance Co.*, 32 N. Y. 619; *Hartshorn v. Insurance Co.*, 15 Gray, 240; *Faughner v. Insurance Co.*, 86 Mich. 536.

Courts cannot make contracts for parties, and in interpreting them cannot be influenced by the hardships of a particular case. Chancellor Kent said in *Perkins v. Insurance Co.*, 4 Cow. 645:

"The interpretation of contracts and the administration of justice ought to rest on general and fixed principles, and not on views of temporary hardship or expediency."

I have carefully examined the authorities cited in plaintiff's brief, and none of them are, in my judgment, like the present one. Under the facts of each case, the court held that the minds of insured and insurer had met upon the terms of a contract for insurance. They

do not apply where the minds of the parties have not met. I express no opinion upon the other questions raised.

Judgment must be reversed, and a new trial ordered.

McGRATH, J. I agree with Mr. Justice GRANT in his first proposition, namely, that the court was not justified in instructing the jury that the facts were undisputed, and that the policies were issued on the 2d and 3d of July.

Upon the second point, it is unnecessary to determine whether or not the title to the lumber contracted to be sold to E. & B. Holmes passed, as the policy was undoubtedly intended to cover lumber then piled upon the docks, and which had not passed out of the possession of the insured, even though sold.

I cannot agree with the proposition that no valid contract can be predicated upon the facts stated. Schmeck was the agent for several companies. He was directed to place a given amount of insurance. It was not expected that he would place the entire risk in any one company. In was perhaps known that no one company would assume the whole amount of insurance. The companies were not mentioned. Under these circumstances, no contract existed as to any one of the companies, nor as to all of them, and no liability attached until something further had been done, and none could have been enforced as against defendant, or any of the other companies. Can there be any doubt but that in the selection of the companies, and in the location and distribution of the risk, Schmeck acted as agent for plaintiff? The rule is laid down in May, Ins. § 125, that the law will not allow a person to act as agent for both the insurer and insured, and, if he does so act, either party may avoid the contract; but the author adds that—

"It may happen that during the negotiations the

agent of the insurer in certain particulars may in certain other particulars be empowered by the insured to act for him, so that the same person becomes now the agent of one and now the agent of the other contracting party."

In *Sparrow v. Insurance Co.* (Cir. Ct. U. S., April, 1873, not reported), cited in 2 May, Ins. § 500, the court held it to be—

"A question of fact for the jury, as to each particular act in the negotiation, whether the agent, who might be acting now for the company and now for the insured, was in fact acting for the one or the other; and the responsibility of each particular act or declaration would rest with that party for whom the agent acted in the matter, and under whose direction and control, as to that particular matter, he might be."

Such an agent is not necessarily the agent of the insurer in every act, because he may be directed in a particular matter by the insured, when, of course, he is the agent *pro hac vice* for the insured. But where such an agent, by his advice, opinion, or otherwise, acting within the general sphere of his duty, leads, directs, or controls the insured, he is the company's agent, and it is bound by his acts and their results. 2 May, Ins. § 500.

In *Sargent v. Insurance Co.*, 86 N. Y. 626, the policy had expired, and the agent had failed to renew it. Held, that there was no contract with defendant beyond its executed policy, but merely an agreement with Munger (the agent) individually, he contracting merely for his own personal services in keeping the property insured, *i. e.*, to procure in the future, and keep in force and available, such an insurance as the plaintiff wanted, in some one of the companies which he represented; that it was understood Munger was to exercise his judgment in behalf of plaintiff in selecting the companies; that

both in selecting the company at the outset, and in keeping the property insured, Munger was to act for the plaintiff, and the acts to be done by Munger were separate and distinct from his relation to the companies.

In *McGraw v. Insurance Co.*, 54 Mich. 145, plaintiff applied to certain insurance agents for a given amount of insurance, which he eventually obtained, dealing only with said agents. Some of the policies were taken out in companies which the agents aforesaid did not represent. After the loss it was claimed by these outside companies that said agents had misrepresented the exposures. The Court held that said agents were not plaintiff's agents for that purpose.

"If the policy," say the Court, "had been issued on written representations, those would no doubt have formed a part of it, if referred to, and there could then have been no ambiguity about the contract. But where the effect of a written contract is made to depend, if this can legally be done in all cases, upon contemporaneous verbal representations, these must, in our opinion, be made by an actual agent, or one whose action is ratified with knowledge of what he has done. * * * The companies always have it in their power to have everything material reduced to writing. It is contrary to general practice in other cases to have an agreement partly in writing and partly in parol. If this can lawfully be done, as perhaps it may be, it must nevertheless stand as written, unless varied. by authority, and an assured party is not bound to inquire how far unauthorized persons have undertaken to represent him in matters of which he has no notice. The policy refers to property fully identified. He could not be bound to assume or imagine that anything further had been represented about it, except by his own agents, of whose acts he is bound to inform himself. No one would be safe in taking out insurance under any other rule. The insured has a right to know where he stands, and, while he takes the risk of his own representatives, he cannot be subjected to those of persons whom he has never appointed or recognized."

In the present case there was nothing in the service to be performed by Schmeck for plaintiff inconsistent with the former's duty to defendant as agent. Indeed, in the ordinary course of business, this very service might well be contemplated and expected by both parties. Schmeck having been directed to select the insurers and distribute the risk, both parties were bound by that selection and distribution when made. Both parties contemplated several contracts, and both were bound as the several contracts were executed. Neither defendant nor any of the other insurers was bound until that selection and distribution was made. Neither had agreed to take all or any specific portion of the amount. Defendant received no proposition to issue a policy for the whole amount. It received an application for the exact amount for which the policy executed by it was issued.

The illustration as to the 1,000,000 feet of lumber is not an apt one. If A. directs B. to purchase 15,000,000 feet of lumber, knowing that it must be purchased in 15 different parcels and of as many different persons, and B. enters into 14 different separate contracts, with as many persons, on behalf of A., for 14,000,000 feet, it is evident that neither of the 14 persons could repudiate the contract simply because B. had not contracted with still another person for an additional 1,000,000 feet, nor could A. repudiate the contract because his agent had not purchased the additional 1,000,000 feet. To the extent that B. dealt with each, his authority was ample, and bound his principal, and none of the parties with whom B. contracted were concerned in his failure to make further contracts. The insurers in the present case were in no different position than if the lumber had been insured for the entire amount, and one of the policies had been canceled, and it is not claimed that the amount of the ad-

92 MICH.—32.

ditional insurance was represented as greater than it actually was.

The name of the company, the location and amount of the risk, in each case, had been committed to Schmeck. The rate of premium not having been paid or fixed by the parties, plaintiff became liable to pay the usual or going rate. The policies contained no provision that they should not become operative until the premiums were paid. Schmeck had written other policies for the same parties, and had afterwards, in the usual course, collected his premiums, and no demand was made for the premiums at the time that the insurance was applied for. In determining such matters, consideration must be had for the manner in which the business has been usually carried on. To lay down the rule that in all cases the premiums must expressly be agreed upon and paid, or credit expressly given, would be contrary to the general understanding among business men, and contrary to prevailing methods.

The judgment is reversed, and a new trial ordered.

MORSE, C. J., LONG and MONTGOMERY, JJ., concurred with McGRATH, J.