THOMSON *v.* FLINT & PERE MARQUETTE RAILROAD CO.

1. LOST DEED—SECONDARY EVIDENCE.

    Whether the loss of a deed has been sufficiently proved to warrant the admission of secondary evidence of its contents is a question for the court, and not for the jury.

2. SAME.

    Testimony that a deed executed by witness as executor was in his possession in the custom house, where he was employed, that subsequently, both before and after leaving the custom house, he looked for it everywhere he thought it likely to be, but was unable to find it, and that he never took it into the office of testator's estate, is sufficient proof of loss to justify the admission of secondary evidence, though it is not shown that search was made among the papers in the estate's office.

3. SAME—CREDIBILITY OF WITNESSES—INSTRUCTIONS.

    Where, in ejectment against one claiming under a lost deed, a witness having no interest in the matter testifies to the execution of the deed and to its loss, and no purpose to withhold or destroy the paper, nor anything suspicious about its loss, is shown, it is not error to instruct the jury that the testimony of such witness, being undisputed, establishes the execution of the deed.

4. SAME—RAILROAD RIGHT OF WAY.

    In ejectment against a railroad company claiming under a lost deed, a contention that the substance of the deed was not sufficiently proved cannot be sustained where a witness testified positively that it was an absolute conveyance for a right of way across the lot in controversy.

5. DEEDS—RIGHT OF WAY—SUFFICIENCY OF DESCRIPTION.

    Where the parties to a conveyance of a railroad right of way have gone upon the premises, and located and established the right conveyed, it cannot afterwards be contended that such right was a mere floating one.

6. SAME—DELIVERY—SEVERAL GRANTORS.

    Where a deed is executed by one of the grantors, and delivered to the grantee, without any qualification, or any intention to withdraw it, it is operative as to such grantor, notwithstanding a failure of delivery as to another grantor.

Error to St. Clair; Vance, J.   Submitted April 23, 1902.
(Docket No. 127.)   Decided June 17, 1902.

Ejectment by John W. Thomson, Jr., and Kate V. Calder against the Flint & Pere Marquette Railroad Company, the McMorran Milling Company, and the Chicago & Grand Trunk Railway Company.   From a judgment against the first-named defendant, and in favor of the other defendants, plaintiffs bring error.   Affirmed.

Lots 41, 42, and 43 of the village of Peru, now city of Port Huron, are water lots fronting on the St. Clair river, lying adjoining to, and south of, Court street.   Lot 40 is also a water lot, lying north of Court street, and owned by the McMorran Milling Company.   Daniel B. Harrington in his lifetime owned lot 41; the Sanborn and Sweetzer estates, of which John P. Sanborn was executor and trustee, owned lot 42; and James Beard owned lot 43. Henry McMorran and Charles F. and E. B. Harrington (the latter two being sons of Daniel B. Harrington) constituted a copartnership known as the McMorran Milling Company, and in 1875 commenced building a gristmill on lot 40, and the mill was completed and in operation in 1877.   After the mill was in operation some time, the McMorran Milling Company laid down tracks across lot 41 and the other two lots south, connecting their mill with the railroad tracks about 1,400 feet south.   Daniel B. Harrington died in 1878.   Charles F. and Edmund B. Harrington were made trustees of his estate, and, while in control of the estate, the Port Huron & Northwestern Railroad Company, in which they were interested, placed other tracks across said lot 41.   The Port Huron & Northwestern subsequently sold to the Flint & Pere Marquette Railroad Company.   In 1885 an elevator was built on lot 40 by the Port Huron & Northwestern Elevator Company, a corporation, in which Henry McMorran and Charles F. and Edmund B. Harrington were interested as stockholders and officers; and another railroad track was laid across

the front of lot 41, connecting the elevator with the main
line of railroad tracks south.    In the partition of the Har-
rington estate, lot 41 was assigned to Ida A. Thomson and
Kate V. Calder, daughters of Daniel B. Harrington, at an
appraised value of $11,000.    The interest of Ida A. Thom-
son was devised by her will to her husband, John W.
Thomson, Jr.    In 1895, after the plaintiffs acquired title,
and after due notice to the defendants to remove their
tracks from lot 41, the plaintiffs brought this action of
ejectment.    A short time after the partition proceedings,
Ida A. Thomson died, leaving her interest in lot 41 to her
husband, John W. Thomson, Jr.; and he and Kate V.
Calder, as plaintiffs, a year later instituted this suit against
the Flint & Pere Marquette Railroad Company, the Chi-
cago & Grand Trunk Railway Company, and the McMor-
ran Milling Company.

Lot 41 is located at the foot of Court street, and fronts
on the St. Clair river, and runs west to First street.    At
the time of Daniel B. Harrington's death there was a rail-
road track across lot 41, near the west end of the lot; the
railroad being laid upon an embankment, and running
from a mill located on the west part of lot 40 to connect
with the Port Huron & Lake Michigan Railroad, on the
south side of Griswold street.    This so-called mill track
had been constructed between one and two years prior to
the death of Mr. Harrington, under the following circum-
stances:    Mr. Harrington, being desirous that his sons,
Charles F. and Edmund B., should engage in the milling
business, induced Henry McMorran to form a partnership
with them for the purpose of erecting a large flouring mill
on lots 39 and 40, at the foot of Court street, lying imme-
diately north of, and adjacent to, lot 41, and such partner-
ship was formed under the name of McMorran & Co.
Some years after the death of Daniel B. Harrington, the
firm was incorporated as the McMorran Milling Company,
and is one of the defendants in this suit.    About 1876 the
erection of the flouring mill was commenced,—located, as

above stated, on the west part of lot 40,—and, when completed, cost upwards of $60,000.    Mr. McMorran furnished one-third of the capital, and the Harringtons furnished their share of the funds required for constructing the mill.

Mr. Harrington, from the time the work was started until the mill was built, and the embankment thrown up, and the track laid connecting the mill with the railroad, supervised and directed the enterprise both of constructing the mill and making the railroad connections.    At the time the mill was erected, the only railroad in the city south of Black river was the Port Huron & Lake Michigan, which was in operation from Port Huron to Flint, and was known as the "Bancroft Road."    Its terminal in Port Huron was on the south side of Griswold street. Griswold street runs parallel with Court street, and the distance between the termination of the railroad track south of such street and the location of the mill was about 1,500 feet.    The land over which the mill track was required to be built was submerged, having from 2 to 3 feet of water upon it; and, in order to build the connection, it was necessary to dredge along the margin of the river across the marsh for 1,500 feet and upwards, throwing up an embankment above the level of the river sufficiently wide upon the top to carry a railroad track.    Without a railroad connection the mill would have been of but little value, and therefore Mr. Daniel B. Harrington was anxious to have a railroad connection put in; and, at his suggestion, negotiations with Mr. Bancroft were entered into with such object in view.    The evidence on the part of the defendants tended to show that, in order to secure the right of way for the railroad track, across the land of the individuals above named, to that controlled by the railroad company, Daniel B. Harrington drew up a deed between himself, James Beard, and John P. Sanborn, as executor of the Sweetzer and Sanborn estates, of the first part, and Henry McMorran, of the second part, conveying a right of way for a railroad with one or more tracks

across lots 41, 42, 43, and the river front to the railroad
land.    After this deed had been drawn up and signed by
Mr. Harrington, it was given by him to Mr. McMorran,
who took it to Sanborn to obtain his signature.    Mr. San-
born informed Mr. McMorran that he would prefer that
he should secure the signature of Mr. Beard, and that
then he would take the deed to Detroit and get the opinion
of his counsel, Mr. Holbrook.    After securing the signa-
ture of Mr. Beard, Mr. McMorran took the deed a second
time to Mr. Sanborn, who carried it to Detroit and sub-
mitted it to his attorney, D. C. Holbrook; and, after get-
ting his opinion, he signed it on behalf of the estates
which he represented, and on his return put it away, so
that Mr. McMorran could get it when he should call for
it.    Some time afterwards, when Mr. McMorran called for
the deed, Mr. Sanborn was unable to find it; and up to
the present time he has been unable to ascertain its where-
abouts, although at different times he has made a search
for the deed at the request of Mr. McMorran.

On the trial a judgment was obtained by the plaintiffs
against the Flint & Pere Marquette Railroad Company,
but the court directed a verdict against the plaintiffs in
favor of the McMorran Milling Company and the Chicago
& Grand Trunk Railway Company.

*John B. McIlwain,* for appellants.

*Herman W. Stevens* and *John C. Graham,* for
appellee McMorran Milling Co.

*E. W. Meddaugh,* for appellee Chicago & Grand
Trunk Railway Co. ˙

Grant, J. (*after stating the facts*).    1. It is insisted
that the proof of loss of the instrument was insufficient to
justify the admission of secondary evidence.    The ques-
tion whether the loss has been sufficiently proved must be
decided by the court at the trial.    It is not a question for
the jury.    Those relying upon a lost document must estab-

lish the execution of the document, its loss, and a diligent but unsuccessful search for it in places where it is most likely to be found. 1 Greenl. Ev. (15th Ed.) § 558. Mr. Sanborn testified to the execution of the paper by Mr. Harrington; that it was brought to him by Mr. McMorran; that he asked McMorran to secure the signature of Mr. Beard; that his signature was secured; that he took it to Detroit, consulted his attorney, and then executed it himself; that the witness was then in the custom house, where he had the paper; that he looked everywhere he thought it was likely to be; that, after he left the custom house, he "went through all the papers where it was likely to be; that he did not take it into the estates' office at all; that it never was in the estates' office, that he knew of." This testimony stood uncontradicted, and, we think, justified the court in holding that reasonable search had been made, and that its loss had been proved.

2. It is urged that the court erred in directing a verdict in favor of the defendants the McMorran Milling Company and the Chicago & Grand Trunk Railway Company, and in saying to the jury that "the testimony of John P. Sanborn was undisputed, and established the fact that Daniel B. Harrington executed a paper which gave to the McMorran Company the right of way for one or more tracks across lot 41." Counsel for plaintiffs relies upon *Hagan* v. *Railroad Co.*, 86 Mich. 615 (49 N. W. 509), and *Michigan Pipe Co.* v. *Insurance Co.*, 92 Mich. 482 (52 N. W. 1070, 20 L. R. A. 277). In those cases there were facts and circumstances tending to throw discredit upon the statements of the witnesses, and held to be inconsistent with the testimony which was claimed to be undisputed. We find nothing in this case to bring it within the rule of those cases. Mr. Sanborn had no interest in the matter. No purpose or intention to withhold or destroy the paper, or anything suspicious about the circumstances of its loss, was shown. We find no error in thus instructing the jury.

3. It is next insisted that the substance of the writing was

not sufficiently proved. This contention cannot be sustained. Mr. Sanborn testified positively that it was an absolute conveyance for the right of way across lot 41. Counsel seeks to bring the case within that of *Taylor* v. *Adams*, 58 Mich. 187 (24 N. W. 864), where a witness was not able to give either the description or number of the lot stated in a certain contract, and yet was permitted to testify that it was the same one in question in that suit. Here the lot is clearly identified, and a railroad right of way over it is a sufficient description after it has been located by the parties and used for a period of 20 years by the grantees.

Counsel also insists that this was a "mere floating right," under the rule of *Detroit, etc., R. Co.* v. *Forbes*, 30 Mich. 165. The description in that case, which was held to be a "mere floating right," was of "100 feet in width, being 50 feet on each side of the line which may be hereafter established by said company for the route of their railroad over and across the following described land," being a 40-acre tract. Before the controversy arose the company had not located its route. Evidently, if the location had been made, the deed would have been held good; for the opinion says: "Until such actual location, therefore, the title of the whole 40 acres remained in the plaintiff below, and it was competent for him to do with or upon it all he could have done before the deed was executed." The question involved in that case was whether the owner of the land could maintain an action of *assumpsit* against the company for failing to remove a certain barn located upon the land. In this case Mr. Harrington was present when the right of way was constructed, and superintended it. If the right conveyed was a floating one, it had become fixed when both the grantor and the grantee went upon the land and established the right of way.

4. We think there was sufficient evidence, so far as Mr. Harrington was concerned, of the delivery of the deed. He had executed it and delivered it without any

qualification, or any intention to withdraw it.   It was executed by other adjoining owners, over whose property the road must be constructed.   It was constructed over submerged lands by throwing up a roadbed at great expense.   It is apparent that all the parties understood that no title to a right of way could be obtained except by a written instrument.   No other conclusion is possible than that such an instrument was executed, upon which all the parties thereto acted.

We think the case was rightly disposed of, and must be affirmed.

HOOKER, C. J., MOORE and MONTGOMERY, JJ., concurred.   LONG, J., did not sit.