GEORGE P. WESCOTT *vs.* JAMES MITCHELL.

Cumberland.    Opinion July 25, 1901.

*Contracts.    Consideration.    New Promise.    Sales.*

The mere agreement to perform an existing contract obligation, by one party to a contract, is not a valid consideration for a new promise by the other party.

The plaintiff and defendant by a contract, prior in time to the one in suit, agreed that the defendant should have an option to purchase the plaintiff's interest in the shares of a certain railroad corporation. Subsequently, by a contract which is described by recitals as being explanatory of and supplemental to the former one, and intended to make that contract conform more clearly to

the "original understanding" of the parties, the defendant agreed to purchase and pay for the same stock. In an action for breach of this agreeement, the defense to which was a want of consideration, *held;* that the second contract must be regarded as supplemental to the first one, rather than explanatory of it, so far as the defendant's agreement to purchase is concerned.

*Also;* no consideration is shown for the defendant's promise, for breach of which the suit is brought, beyond the agreement of the plaintiff to perform obligations existing under the first contract.

On report. Judgment for defendant.

Action to recover $7657 and interest for 522 shares of stock of the St. Croix & Penob. R. R. Co., which the plaintiff averred that the defendant agreed to purchase of him, and pay for, at that price.

*J. W. Symonds, D. W. Snow, C. S. Cook, and C. L. Hutchinson; H. B. Cleaves,* for plaintiff.

*C. E. and A. S. Littlefield, for defendant.*

SITTING: WISWELL, C. J., STROUT, SAVAGE, FOGLER, POWERS, JJ.

SAVAGE, J. Action for breach of contract to purchase and pay for the rights and interest of the plaintiff in five hundred and twenty-two shares of the capital stock of the St. Croix & Penobscot Railroad Company.

The plaintiff and defendant had the contract for building the Washington County Railroad, and for reasons satisfactory to themselves, they deemed it to be for their interest to secure a controlling interest in the capital stock of the St. Croix & Penobscot Railroad Company. Accordingly, on August 17, 1894, they made a contract with one C. A. Boardman, Trustee, for the purchase of five hundred and twenty-two shares of the stock of that company, at $23 per share, and paid for the same. The sale by Boardman was on condition that the purchasers should construct an extension of the St. Croix & Penobscot Railroad from its then terminus to the Maine Central Railroad, the extension to be commenced before July 1, 1895, and completed before December 31, 1896; and it was provided that if the construction of the extension should not be commenced before July 1, 1895, the agreement for the sale of stock should be null and void, and the stock, if

demanded within four months after July 1, should be re-transferred to Boardman, on his paying the purchase price and interest. The stock itself was transferred to a trustee to hold for the benefit of the plaintiff and defendant. The extension not having been commenced within the time limited, Boardman elected to cancel the contract and tendered back the money due under it. Whereupon a new contract was entered into between Boardman and the plaintiff Wescott, September 21, 1895, by which Boardman agreed that the stock should be assigned and delivered to Wescott, and Wescott agreed to pay the purchase price of $23 per share, and make certain other payments to Boardman. It was agreed that Wescott should hold the stock for the joint account of Boardman and himself, and that no sale of the stock should be made within three years, except by mutual agreement. The profits arising from the holding or sale of the stock were to be divided equally between the plaintiff and Boardman. Afterwards, on October 25, 1895, the plaintiff and defendant entered into a written agreement between themselves concerning the use of this stock, and in that agreement the later Boardman contract was referred to and some of its particulars specified. In this agreement it was recited that the defendant had paid one-half of the price of the stock; that the Boardman contract, though made in the name of the plaintiff, was and stood for the joint benefit of the plaintiff and defendant; that the defendant had an equal interest with the plaintiff in the stock and all rights thereunder; that the defendant was entitled to an equal share with the plaintiff in all profits derived from the stock, or from the Boardman contract; and that the defendant, on the date of the Boardman contract, September 21, 1895, had ordered the trustee to transfer his half of the stock to the plaintiff, who paid no consideration therefor. These recitals establish the fact that the defendant then owned one-half interest in the stock, but subject to the Boardman contract.

On March 2, 1896, the plaintiff withdrew from the contract for building the Washington County Railroad, and assigned his interests under the contract to the defendant, and in the agreement of settlement between themselves, of that date, is found the following:

" And said Wescott agrees to hold said St. Croix & Penobscot R. R. Co. stock as it now stands in accordance with the provisions of the agreement between himself and C. A. Boardman, Trustee, dated Sept. 21, 1895, and the agreement between said Mitchell and himself dated Oct. 28, 1895, and not to make any re-pledge of said stock for any purpose at any time during the time limited in said Boardman's agreement; that he will transfer to said Mitchell at said Mitchell's option, with the consent of said Boardman, Trustee, all his rights in and to and all his interests under said agreement dated Sept. 21, 1895, upon said Mitchell paying to him all sums that he may have advanced on account thereof, with interest thereon, and assuming all his obligations thereunder and guaranteeing him against all loss, cost, damage or expense on account thereof."

Still later the plaintiff and defendant made a further agreement concerning this stock, which we incorporate herein in full, as follows:

" Memorandum of a supplementary agreement between George P. Wescott of Portland, Me. and James Mitchell of Portland, Me. made this fourth day of December, 1897, supplementary to and explanatory of an agreement entered into between the same parties dated the second day of March, 1896, Witnesseth, that in order to make said contract of March 2nd, 1896, clearly conform to the original understanding of the parties thereto, the said James Mitchell hereby agrees to and with the said George P. Wescott to purchase and pay for the said Wescott's interest in the St. Croix & Penobscot Railroad stock therein referred to, and pay said Wescott therefor the sum of seven thousand six hundred and fifty-seven dollars with interest thereon from September twenty-first, 1895, on or before September 21st, 1898, and upon such purchase and payment while said Mitchell is not to have an actual transfer of said stock except by the consent of said Boardman during the time limited as subject to said Boardman's consent, he is upon said purchase and payment to succeed to and have all of said Wescott's rights in said stock subject to said agreement between said Westcott and Boardman dated September twenty-first, 1895." It is for a breach of

this latter contract, on the part of the defendant, that this action is brought.

The defense is twofold. First, that by the terms of the contract the time of its performance is made essential, and that the plaintiff on his part failed and refused to perform within the time limited, namely, September 21, 1898, and that, therefore, the plaintiff is not now in position to compel performance on the part of the defendant, or to recover damages for non-performance; secondly, that there was no consideration for defendant's promise.

Without assenting to or discussing the correctness, as a matter of law, of the first position taken by the defendant, we need only say that we think the evidence is plenary that for many days, even weeks, after September 21, 1898, the defendant and his attorneys were treating the contract of December 4, 1897, as still subsisting. Although the correspondence was voluminous, it gives no hint of any purpose on the part of the defendant to claim that the contract was at an end. We think this defense, if it otherwise had any merit, must be regarded as waived.

But the second and real defense presents a serious difficulty. It is undoubtedly true that the contract of March 2, 1896, so far as relates to the purchase of the plaintiff's stock was unilateral. It gave to the defendant an option on the stock, without any expressed limit of time for the exercise of the option, but he was under no obligation whatever to buy. On the other hand, the plaintiff expressly bound himself to transfer his interest in the stock to the defendant, at the defendant's option, with the consent of Boardman, and further agreed not to re-pledge the stock for any purpose at any time during the time limited in the Boardman agreement. The transfer was to be made to the defendant upon his payment of all sums which the plaintiff might have advanced on account of the stock, with interest thereon, and upon the defendant's assuming all of the plaintiff's obligations under the Boardman contract, and guaranteeing him against all loss, cost, damage or expense on account of the same. Such were the rights and obligations of the parties under the contract of March 2. Now the contract of December 4, which is the basis of this suit,

purports to be "supplementary to and explanatory of" the contract of March 2. Its expressed purpose is to make the contract of March 2 "clearly conform to the original understanding of the parties." By this contract the defendant agreed to purchase and pay for the plaintiff's interest in the stock, on or before September 21, 1898, the purchase price being seven thousand six hundred and fifty-seven dollars, with interest thereon from September 25, 1895. The contract, as we construe it, further provided that the defendant was to succeed to the plaintiff's rights in the stock upon purchase and payment at any time, but was not to have an actual transfer of the stock during the time limited in the Boardman agreement, without Boardman's consent. Now it is evident that by this new contract, the defendant ceased to have an option merely on the stock, but he agreed to become the absolute purchaser, and he is now bound by his contract, if there was any consideration for his agreement.

Upon careful analysis of this contract, and of the other evidence in the case, we fail to find any consideration to support the contract. The rights and obligations of the plaintiff were not in any degree changed to his detriment. The purchase price, as shown by computation, appears to be the same. The new contract does not purport to release the defendant from assuming plaintiff's obligations under the Boardman contract or from guaranteeing the plaintiff against loss under it. In fact, the case shows no obligation or liability to loss which is not covered by the provision in the new contract that the defendant was to have the plaintiff's rights in the stock, "subject to the agreement between Wescott and Boardman." The change from the unlimited time of the option to the fixed limit of time in the new contract, "on or before September 21, 1898," was rather advantageous than otherwise to the plaintiff. The provisions in the new contract relating to transfer are couched in somewhat different language from those in the old one, but the effect is substantially the same. At least, there is no change to the disadvantage of the plaintiff. The plaintiff made no new contract. He did by implication agree to convey his interest in the stock upon purchase and payment

by the defendant, but this he was already legally bound to do by the former contract, and for this reason no new consideration arose.

We think the law is settled by the great weight of authority, that the mere agreement to perform an existing contract obligation by one party to a contract is not a valid consideration for a new promise by the other party. *Wimer* v. *Overseers of the Poor of Worth Township*, 104 Pa. St. 317 ; *King* v. *Duluth M. & N. Ry. Co.*, 61 Minn. 482 ; *Lewis* v. *McReavy*, 7 Wash. 294 ; *Vanderbilt* v. *Schreyer*, 91 N. Y. 392 ; *Jackson* v. *Cobbin*, 8 M. & W. 790. See note to *Ferguson* v. *Harris*, 39 Am. St. Rep., at p. 745.

We are not called upon to consider the large class of cases concerning promises made to induce an unwilling party to complete his contract, nor those where the new promise is made by a stranger to the contract, in which classes of cases there seems to be much contrariety of opinion. Nor is this a case where the parties have mutually abandoned an old contract, or waived its terms, and have made a new contract in consideration of new and mutual promises. Nor is it a case, so far as appears, where the parties have corrected an earlier contract erroneously expressed. Parties, no doubt, have a right to abandon a contract, and make a new one to suit themselves for new considerations. They have a right to modify a contract, for new considerations. And it may well be that errors may be corrected and omissions supplied, by explanatory writings, without new consideration.

In this case the contract declares itself to be "supplementary," a term which well comports with the idea of new provisions in a contract. It is said, indeed, that it is "explanatory," and that it is to make the original contract "clearly conform to the original understanding of the parties." But what it explains, or in what way it makes the old contract "conform," does not appear. No light is thrown upon the question by any testimony from the parties themselves. Nor do sufficient extraneous circumstances appear from the contracts and other documentary evidence to give us any aid. Some things appear to be more carefully and exactly expressed, in the new contract, as, for instance, the amount of the purchase price, and the conditions attending the transfer of the

stock.   But the vital thing in the new contract does not seem to be "explanatory," and that is the engagement of the defendant to purchase and pay for the stock.   A liability on his part is created where none existed before.   This is rather "supplementary" than "explanatory."

If it be said that the new contract was made to correct an error or supply an omission, the question arises at once, what error, what omission?   The only apparent change in the contract was from an "option" on the part of the defendant to an express engagement, to buy and pay for.   Was the granting to the defendant of an "option" in the first contract, an error?   It can hardly be believed. When two competent business men engage in a negotiation for the sale of stock, and it is understood that the would be purchaser is to become absolutely bound to purchase, it is hardly to be supposed that they will express their understanding by giving the purchaser merely, but expressly, an option.   It is difficult to believe that two gentlemen of recognized great business capacity, such as these parties are, in preparing a contract of great consequence to themselves, should have fallen into the error, so-called, of calling an absolute purchase a mere option.   At least, we think so improbable a theory should be supported by proof rather than guesswork before we adopt it.

If it be supposed that the new contract was made to supply an omission in the old one, a slight examination will disclose how baseless the supposition is.   The use of the word "option" negatives the claim that an agreement to purchase was omitted.   This was expression, not omission.   The use of the word "option" necessarily and affirmatively excludes any absolute agreement to purchase. By its use the parties assert a fact entirely inconsistent with the existence of an agreement to purchase.   We think they did not *omit* to express a contract of purchase, for they did express an option.

But it is suggested that this new contract was entered into to make the old contract "conform to the original understanding," and, indeed, the new contract itself says so.   But what "original understanding" is meant?   Does it mean the understanding at the

time the old contract was made, or some antecedent understanding? Even the old contract refers to an "original understanding" relating to the St. Croix & Penobscot R. R. Co.

The real question is, was the old contract, the contract of March 2, made according to the understanding of the parties at the time. If so, it was not subject to correction of errors. It embodied the real agreement. If so, it was not competent for the parties afterward to embody some antecedent original undertaking in the form of a new contract, and thereby bind the defendant to an additional engagement on his part, unless there was a new consideration. The contract of March 2 appears to have been carefully and deliberately drawn, and for reasons already stated, we think it expressed the meaning of the parties at the time it was made, without error or omission, so far as relates to the purchase of the stock.

Accordingly, we think the contract sued upon must be deemed a new contract, and if that be so, we have already shown that there was no consideration for the defendant's promise.

*Judgment for the defendant.*