## CHARLESTON.

CORNS-THOMAS ENGINEERING & CONSTRUCTION COMPANY V.
COUNTY COURT OF McDOWELL COUNTY.

Submitted November 14, 1922.   Decided November 21, 1922.

1.   EVIDENCE—*Parol Evidence Admissible to Supply Omission from Written Contract.*

   Parol evidence is admissible to supply what is omitted from a written contract that does not express the entire agreement or that appears on its face not to have done so.   (p. 375).

2.   SAME—*Parol Evidence Admissible to Supply Omission from Working Plan in Contract as to Depth of Excavation Agreed on.*

   In an action upon a written contract for erection of bridge abutments, including the excavations at specific prices per cubic yard, parol evidence is admissible to supply an omission from the working plan referred to in the contract, or specifications of the depths of the excavations, agreed upon.   (p. 375).

3.   SAME—*Parol Evidence Inadmissible to Prove Depths of Excavation Different from Those in Plan Referred to in Written Contract.*

   If, in such an action, a plan showing the required depths of excavation was in existence at the date of the contract and is referred to therein, parol evidence is not admissible to prove such depths were different from those shown in such plan.   (p. 375).

4.   SAME—*Parol Evidence Admissible to Prove Written Contract was Procured by False Representation in Order to Prove Right to Rescind.*

   But, in either of such cases, parol evidence is admissible to prove that the contractor was induced to enter into the contract to do the work at prices therein specified, by a false statement made by the other party to it, or his agent, for the purpose of showing a right of rescission of the contract, on the ground of mutual mistake or mistake on the part of the contractor and fraud on the part of the other party, in connection with other evidence tending to prove assertion of such right and a parol modification of the contract, to avoid the consequences of such mistake or fraud.   (p. 378).

5.   CONTRACTS—*Parol Contract Correcting Written One by Modification or Substitution Need Not be Supported by Any Consideration.*

For a parol contract made for correction of a mistake in a written one, by modification or substitution, no new consideration is necessary.   (p. 381).

6.   SAME—*Agreement Modifying Written Contract or Substituting New Agreement Therefor to Correct Written Contract May Arise by Conduct of Parties.*

Such modification or new contract need not be formal nor express.   It may arise out of the conduct of the parties, by implication. · (p. 381).

7.   COUNTIES—*County Court Having Entered Into Contract Voidable by Contractor May Bind Itself by Implied Contract of Modification, in Absence of Statute to Contrary.*

Unrestrained by any statute, in respect of the form or manner of its contracts for construction of roads and bridges, a county court. having entered into such a contract in writing, under circumstances rendering it voidable at the instance of the contractor, may bind itself by an implied contract of modification or substitution, by way of elimination of the infirmity in its written contract.   (p. 381).

8.   SAME—*County Court Held Bound by Implication to Modification of Contract; Notice to President of County Court of Contractor's Intention to Perform Modified Contract Held Notice to Court.*

Notice to the president of a county court, of a *bona fide* claim on the part of the contractor in such a contract, of right of rescission thereof, strongly probative facts upon which such claim is based, his willingness to perform it with such modification as will cure its infirmity, and his intention to do so at the request of such president, is notice of such facts to the county court itself, and its subsequent silence and lack of objection to the prosecution of the work, with expectation of additional compensation by way of adjustment, binds it by implication to such modification and payment of such compensation.   (p. 382).

9.   SAME—*Contractor Held Not Precluded from Rescinding Contract for Misrepresentations by Stipulation in Contract.*

If, in procuring such a contract, an agent of a county court, by way of inducement thereof, makes a false representation, of such character as, under the circumstances attending it, vests in the contractor right of rescission of the contract, upon

the ground of mutual mistake or mistake accompanied by fraud on the part of the agent, the contractor is not precluded from the exercise of such right, by stipulation in the contract, to the effect that, at the date of execution thereof, he was fully informed as to all conditions affecting the work to be done, as well as the labor and materials to be furnished, that such information was secured by personal investigation and research and not wholly from the estimate of the engineer, and that he will make no claim against the county court by reason of estimates, tests or representations made by any of its officers or agents. (p. 385).

10.    CONTRACT—*Not Construed so as to Make it Available as an Instrument of Fraud and Oppression.*

A contract containing such a stipulation cannot be so construed as to make it available as an instrument of fraud and oppression, consistently with the rules of interpretation. (p. 385).

11.    APPEAL AND ERROR—*Award of New Trial, Where Evidence is Incomplete and Verdict Palpably Excessive, Will not be Disturbed.*

Award of a new trial in a case in which the evidence as to right of recovery, upon which the verdict stands is weak, incomplete and indefinite, and in which the verdict is palpably excessive, will not be disturbed by the appellate court. (p. 386).

Error to Circuit Court, McDowell County.

Action by the Corns-Thomas Engineering & Construction Company against the County Court of McDowell County. Judgment for plaintiff, and defendant brings error.

*Affirmed.*

*Strother, Sale, Curd & Tucker*, for plaintiff in error.

*G. L. Counts, Strother & French* and *G. W. Howard*, for defendant in error.

POFFENBARGER, PRESIDENT:

The subject matter of complaint on this writ is the award of a new trial in an action of assumpsit, brought for recovery of compensation for alleged extra work under a contract for the construction of two concrete abutments and the necessary

wing-walls, for each of two bridges across the Tug River in McDowell County, one of which is known as the Roderfield bridge and the other as the Negro Branch bridge. Under the contract, the plaintiff not only built the four abutments and the wing-walls, but also made the excavations for the same, and the work sued for as being extra was done in connection with the excavations for the abutments. The jury returned a verdict in favor of the plaintiff for $15,543.12, which the court set aside.

In the two contracts, one for the work for each bridge, unit prices for excavation and for concrete were adopted. For the work at Roderfield, $5.00 per cubic yard was agreed upon for the excavation, and $18.00 per cubic yard for the concrete. For the Negro Branch work, the prices were, respectively, $2.25 and $17.50. This controversy arises out of alleged misrepresentations by a civil engineer, an employee of the County Road Engineer of McDowell County, to the plaintiff's president and general manager, as to the depth of the excavation for the abutments, made, if at all, before the plaintiff's proposals to do the work were filed. These representations, if made, were that the excavations for the abutments for the Roderfield bridge would be six feet in depth and those of the Negro Branch bridge, six feet on one side and eight feet on the other. They were made upon the assumption that the depths named would carry the excavations to solid rock. Prior to the date on which they are alleged to have been made, some soundings had been made by which it was supposed solid rock had been reached or located at the depths named. It turned out, however, that they went down only to bolders lying on or above the solid rock which it became necessary to take out, to the end that a better foundation than they afforded might be obtained. For the east abutment at Roderfield, it was necessary to go about one foot deeper, and for the west abutment about three feet and six inches deeper, than was contemplated. For the east abutment of the Negro Branch bridge, it was necessary to go to a depth of 12.4 feet and for the west abutment, 6.8 feet. This charge of verbal representations as to the depth of the con-

templated excavations is supplemented by the further statement that at the time of the making of the proposals, the engineer also represented that the County Court then had no drawings or specifications showing the depths of the excavations. In the testimony of the engineer, there are specific denials of all of these charges. He claims the specifications were filed in the office and were given to all bidders and he supposes the plaintiff's representative saw them. He does not claim, however, that he knows they were actually in the hands of the representative or that they were tendered to him for inspection. The latter admits that a blue print purporting to set forth the plans of the masonry for the bridge at Roderfield, was shown to him before he filed his proposals for the work, but denies that it indicated the depths of the excavations. With his testimony, he files the blue print or one like it, and it does not specify such depths. There is nothing in the record to indicate that any other working plan for the Roderfield bridge was furnished to the plaintiff; but, at some time, a blue print showing the design and specifications for the work at Negro Branch was furnished. The contention of the defendant is that this plan was in its engineer's office at the date of the contract. On the other hand, the plaintiff contends it was furnished after the contract had been made and possibly after the work had been commenced. As to when it was furnished, his evidence is indefinite and unsatisfactory, but he positively denies it was produced when he bid on the work. The depth of the excavations, as indicated by that plan, were 8.2 feet for the west abutment and 12.2 feet for the east abutment. There seems to be no controversy as to the depths to which the excavation actually went. They were as follow; "east Roderfield abutment 9 feet 6 inches, west Roderfield abutment 7 feet, east Negro Branch abutment, 12.4 feet, west Negro Branch abutment 6.8 feet. The excavation at the Roderfield bridge, in excess of what was contemplated, amounts to 113.2 cubic yards. At Negro Branch bridge, it amounted to about 19 yards less than was contemplated, if the blue print showing the depth of excavation at that point, is binding upon the plaintiff. If it is not,

it amounted to about 230 yards more, according to the contentions of the plaintiff. All of the excavation has been paid for at the unit prices, as has also the increased concrete work. The basis of the plaintiff's claim is that the increased depth made the work much more expensive and augmented the risk and hazard of the undertaking. In other words, its contention is that if correct depths had been given, the unit prices would have been higher, for the reasons just indicated. Although all of the excavation has been paid for at the unit prices, it is insisted that the increased depths necessitated extra expenditures amounting to more than $15,000.00. The plaintiff seeks recovery of this amount plus 10 per cent. for supervision, treated as part of the cost. This theory excludes all profit on the alleged extra work and contemplates only reimbursement for actual outlay and compensation for supervision. By its verdict, the jury disallowed the claim for compensation, but allowed the claim for money actually expended in performance of work alleged to have been extra.

Over objections interposed by the plaintiff, the court gave a number of instructions at the instance of the defendant. Although exceptions were taken to the action of the court, in the giving of these instructions, no assignments of error are based upon it. Two instructions requested by the plaintiff were refused. Exceptions were taken to the rulings upon them, but they are not complained of in any assignment of error or argument. In its award of a new trial, the court seems to have proceeded upon one of two theories, lack of right of recovery, by reason of certain provisions of the contract, or excessiveness of the verdict. For the most part, the assignments of error and arguments in support thereof, as well as the argument submitted for the defendant in error, pertain to the right of recovery.

In their negotiations as well as in the making of the contract, the parties used the standard form of specifications and contract, prescribed and printed by the West Virginia State Road Commission. Exclusive of the index, this form makes a book of 117 large pages, and its provisions relate to contracts for the construction of roads, more than bridges. It

sets forth certain definitions of terms, instructions to bidders, award and execution of contracts, general provisions, construction details, form of contractor's proposal, form of contract and form of bond. In it the specifications are set forth for all sorts of work, and such of them as are agreed upon by the parties and made applicable to the particular work, are adopted by reference in the proposal and the contract. It contemplates the preparation and filing in the local engineer's office, as well as with the State Road Commission, of working plans for the particular work contracted for, which are adopted in the proposal and contract, by reference thereto. In each of the proposals here involved, the contractor offered to make, improve and build a bridge, according to the plans therefor on file in the office of the clerk of the County Court; and, in the contract, it bound itself to build and complete the work, in good workmanlike and substantial manner, according to and in the manner provided by the plans and specifications, and the contract recites that it had examined the plans and specifications. This reference to the plans and the recital of the examination thereof, appear in both of these contracts. Although they have very important bearing upon the issues in the case, they are not mentioned in the argument. A stipulation that seems to have impressed the attorneys and the court below more deeply reads as follows: "The party of the second part declares that it is fully informed as to all conditions affecting the work to be done, as well as to the labor and materials to be furnished for completion of the contract, and that such information was secured by personal investigation and research and not wholly from the estimate of the Engineer; and that it will make no claim against the said County Court by reason of estimates, tests or representations heretofore made by any officer or agent of said County Court." There is also a stipulation against liability on the part of the County Court, for anything in excess of the consideration named in the contract; and one against assertion by the contractor of any claim for loss of anticipated profits by reason of any change or any variation between quantities.

approximately estimated and quantities of work actually done.

Strict application of the terms of each of these contracts to its subject matter is resisted in argument, upon the ground that the printed form adopted seems to have been prepared for use in contracts for the construction of roads rather than bridges. In this contention, no force or merit is perceived. The provisions of the contract are very general and their terms can be applied to bridge construction as well as road construction. There can be no uncertainty as to the character of the work called for by it, when read in connection with the specifications and proposals therein referred to. Although it says the contractor agrees to build and complete a bridge, when in point of fact the work contemplated is limited to the building of the substructure for a bridge, constituting only a part of it, the proposal discloses that fact. When the two papers are read together, they leave no doubt as to what kind of work was to be done, and there is no inaptitude in the terms used.

Notwithstanding the stipulation and recital concerning plans, in the Roderfield bridge contract, the evidence of the alleged misrepresentation as to depths of excavations, was admissible, because the contract, as written and signed, supplemented by the only plan of the work at that point, disclosed by the evidence, is incomplete. It does not show the depths of excavation. When a writing bears evidence of incompleteness on its face, oral evidence is admissible to supply the missing or omitted element or factor. *Johnson* v. *Burns,* 39 W. Va. 658; *Rymer* v. *South Penn Oil Co.,* 54 W. Va. 530; *Erie City Iron Works* v. *Miller Supply Co.,* 68 W. Va. 519. Whether this omission in the plan was supplied by the engineer's verbal representation as to depths, was a question for jury determination. It depended altogether upon the oral testimony of Thomas, representative of the plaintiff, on the one hand, and that of Early, representative of the County Court, on the other, viewed in the light of the facts and circumstances. Production of the plan by Thomas, showing no depth of excavation, tends very strongly to corroborate him,

and Early has not testified that there was any other plan.
If that representation was made and the unit prices were
fixed with reference thereto, in the proposal for the contract,
the jury could further have found, from the testimony of
Thomas and the nature of the subject matter, that higher unit
prices would have been inserted in the proposal, if it had been
known that greater depths of excavation would be necessary
to effectuation of the purposes of the parties. The difficulties
and increased cost of deep excavation, are very clearly set
forth in the testimony of Thomas, and, on this point, it is
not in any sense contradicted or rebutted. Hence, although
the excavation has actually been paid for, at the unit prices
named in the contract, the jury could well have found that
the plaintiff was entitled to additional compensation, upon
the theory of extra work, unless recovery thereof is precluded
by some principle of law or provision of the contract.

The inquiry as to the effect of the stipulation and recital
respecting the plans, found in the contract for the other work,
involves consideration of additional facts or a different state
of facts. In connection with that contract, a plan showing
depths has been produced, and we are not advised of any
principle of law, authorizing contradiction of the written re-
cital, by oral evidence. Though this recital cannot be so con-
tradicted, there is a strong tendency in the evidence, to show
that it covers or involves a mistake on the part of the plaintiff
and either a mistake or fraud on the part of the engineer
representing the defendant. The latter admits in his testi-
mony, that from June 14, 1919, until July 25, 1919, that plan
was not in his office. It had been prepared, but, on June 14,
1919, it was sent to the division engineer of the State Road
Commission at Huntington, and was not returned to the de-
fendant's engineer, earlier than July 25, 1919. When origi-
nally prepared, it showed depths of only 2.2 feet for the west
abutment and 4.2 feet for the east abutment. Before it was
sent away, the figures were changed to conform to new sound-
ings made, showing depths of 8.2 feet for the west abutment
and 12.2 feet for the east abutment. The date of the return
of the plan from Huntington is somewhat uncertain. The

letter transmitting it bears date, July 25, 1919, but it is admitted that it might not have been received earlier than the 26th, 27th or 28th of that month. Some time in the week of July 21, Thomas went upon the sites and personally examined them.   On July 27, he interviewed the defendant's engineer and he says it was then that the representations were made. Whether he prepared the proposals for the work on that day is not entirely clear.   The jury could have found that he did. After having prepared them, he says he waited until the afternoon, and then finding that the County Court would not meet for action upon the bids, on the date fixed for it in the advertisement, he went away, leaving the proposals with the clerk of the County Court, unsigned.   Having gone to the northern part of the State to look after some work there, he was stricken with typhoid fever and was unable to give the matter any further attention.   The unsigned proposals were dated, July 29, 1919, but whether that was the date on which they were prepared, or the date upon which it was contemplated they would be acted upon, does not appear.   Some days afterwards, his company was advised that its bids had been accepted.   Thereupon, another agent of the company, one Brast, went to Welch and executed the contracts on behalf of the plaintiff.   As this occurred on August 4, 1919, it is highly probable that the plan for the Negro Branch work was then on file in the engineer's office, and that the recital in the contract refers to a plan actually existing at the time and read and examined by Brast.   If that is true, Brast seeing the plan and the proposal and knowing nothing to the contrary, may have assumed thaat Thomas had based his unit prices and the quantities in the proposals prepared by him, upon the plan and not upon the verbal representation made by Early, as to the depths of the excavations.   If Early made the representation to Thomas, with which he is charged, contrary to the facts shown by the plan, and induced or permitted Brast to sign the contract based upon the false basis, the contract was entered into under a mutual mistake due to innocent failure of Thomas and Early, to inform Brast of what had transpired, or mistake on the part of Brast and

fraud on the part of Early. The latter may have neglected to inform Brast of the erroneous basis of the bid, by oversight, or, seeing Brast's ignorance of the facts, he may have deliberately remained silent and watched him step into what amounted to a trap. He knew the depths before he talked with either Thomas or Brast, for the required depths were ascertained in June, 1919, and he then knew what they were.

If the contract was entered into under such a mutual mistake, or a mistake on the part of the plaintiff and fraud on the part of the defendant, there was right in the plaintiff, upon discovery thereof to rescind the contract and refuse to perform it, and it may have been its duty to do so. As to the date of the discovery, the evidence is uncertain and indefinite. On account of his illness, Thomas was unable to give the company's business or these contracts any attention until the middle of October 1919. It does not appear when the work was commenced, but he says he was not on the job until about the middle of October. The first work seems to have been done on the Roderfield job and it may have commenced about the middle of October. About the middle of November, the west abutment for the Roderfield bridge had been completed and the work commenced on the other one. Some time in December, it was found that the excavation for the latter would have to go considerably deeper than six feet. Then, according to the testimony of Thomas, the matter of additional depth was taken up with Early, Thomas insisting that the formation then reached would be sufficient to sustain the abutment and Early insisting upon excavation to solid rock. Additional tests were made as to the depths to which the work should be continued. About January 22, 1920, high water in the river stopped the work and filled up the excavation. Other interruptions from high water followed. The Roderfield job seems to have been completed and the work at Negro Branch commenced in June, 1920. As to this, however, there is some uncertainty in the evidence. At one place, Thomas says he started the work at Negro Branch in June, after having finished the work at Roderfield. At another place, he seems to say adverse conditions found both at Roderfield and

Negro Branch called for different and additional equipment, and that sheeting was sent to Roderfield for completion of that work. After having experimented unsuccessfully with wooden sheeting in the deeper excavation at Negro Branch, the work was shut down until steel sheeting could be secured. In this connection, he says Early insisted upon the transfer of the long, heavy, wooden sheeting from Negro Branch to Roderfield. From this incomplete, indefinite evidence, the jury may have found the requirement of additional depth at Roderfield was discovered in November or December, after one of the abutments there had been completed, and that such necessity at Negro Branch was not discovered until after June 1, 1920. In as much as it does not appear, that the plaintiff had a copy of the contract, or a copy of the plan for the Negro Branch abutments, until it was ready to begin the work at that point, the jury may have arrived at the conclusion that the plaintiff was ignorant of the mistake made in the execution of the contract for the Negro Branch work, if any, until sometime after that date. Materiality of the time of that discovery and its importance are clearly obvious. The mistake discovered, if any, conferred right to rescind and it may have imposed duty to do so, or, in lieu of rescission, to abide by the contract as made. Neither the right nor the duty, if any, arose until the date of discovery.

Existence of the mistake, if any, does not alone confer right of recovery. It would have constituted ground for rescission. Discovery thereof would have excused further performance and given right to ask for compensation for what had been done, upon a *quantum meruit*. The right of rescission so conferred, however, was lost by delay. One having cause or ground for rescission, by reason of a mistake in a contract, loses it, unless, without delay, he asserts his right to it, in some way. 13 C. J. 618. The same limitation applies in cases of right of rescission on the ground of fraud. *Coffman* v. *Viquesney,* 76 W. Va. 84; *Williams* v. *Maxwell,* 45 W. Va. 291. The time within which the right must be asserted, depends of course, upon the nature of the subject matter of the contract and the circumstances. In the case of

a working contract, such as this, it clearly could not be postponed until after completion of the work.

Nevertheless, the mistake may constitute a factor in a cause of action arising out of it in a different way. It may have constituted a consideration for an oral modification of the written contract, or the substitution of a new one, by oral agreement. When the mistake, if any, was discovered, it operated upon both parties and seriously disturbed their relations. Admission of the right of rescission would have occasioned delay to the defendant, in securing performance of the contemplated work. The plaintiff could have stopped the work and demanded compensation for what he had done. The simplest and easiest way out of the difficulty was a modification of the contract, so as to enable him to go on and complete his contract, without serious loss, and to give the defendant the mutual advantage of completion of the work, even though at greater cost. It is the contention of the plaintiff that there was such modification, though informally made. Thomas says that, upon discovery of the mistake as to the depth of one of the Roderfield abutments, Early, the engineer representing the County Court, was called upon, and that a conference was held upon the ground and a conclusion reached as to what should be done. He does not claim there was any promise on the part of Early to make compensation for extra work. If this matter was brought to Early's attention, at the time at which Thomas says he conferred with him about it, he had notice of it and concurred in the plans then made for further prosecution of the work, upon new requirements of the contract, as to depths, very soon after the discovery of the mistake. According to Thomas' testimony, this conference took place before the second Roderfield abutment was completed, and before work was commenced on the Negro Branch abutments. In the testimony of Early, no denial of these facts is found. As has been said, it is not claimed that he promised any additional compensation; but, evidently at about the same time, the matter was brought to the attention of Eavenson, president of the County Court. As to this there is no controversy, for Eavenson admits it. He gave up the

office in June, 1920, and he states that, before he did so, Thomas told him the work was costing him a great deal more than he had anticipated, because he had gone to considerably greater depths at Roderfield than he had contemplated and that he thought he was entitled to some additional money. He says he told Thomas in reply, that he knew nothing about the details of the work, as Mr. McClaren was attending to them, but that, if the facts were as he stated them and he would come before the court and establish them, an adjustment would be made. He further says the work had not then been completed and that he told Thomas to go on and finish it. If this evidence constitutes a sufficient basis for a finding that there were oral modifications of the contract, so as to allow compensation by way of adjustment, the modifications took place in due time.

Thomas claims he relied upon this understanding, as a new contract for adjustment, covering the Negro Branch work as well as the Roderfield work, went on and completed both jobs, and then went before the County Court for an adjustment. In the meantime, Eavenson had ceased to be a member of that body. Negotiations resulted in an offer on the part of the County Court to pay an additional $1,000.00, which the plaintiff rejected.

That a written contract, whether under seal or not, may be modified or a new one substituted for it, by a parol contract subsequently made, is well and clearly established as a legal proposition, by our decisions. *Shepherd* v. *Wysong*, 3 W. Va. 46; *Baird* v. *Blaingrove*, 1 Wash 170; *White* v. *Toncray*, 5 Gratt. 179; *Noyes* v. *Caperton*, 68 W. Va. 13; *Simpson* v. *Mann*, 71 W. Va. 516; *Parkersburg etc. Co.* v. *Smith*, 76 W. Va. 246; *Producers Coal Co.* v. *Midland Coal Mining Co.*, 82 W. Va. 311. It is well settled also, that no new consideration is necessary for, or essential to, a modification made for correcting a mistake in a contract. "Where a controversy, whether of law or fact, arises between parties under an existing contract, and they adjust it by making a new contract, such new or modified contract is not without consideration, and it is not admissible to go behind it to ascertain which

party was right in his contention." *Producers Coal Co.* v. *Midland Coal Co.*, cited. To the same effect see 13 C. J. 592; *Bullock* v. *Johnson,* 110 Ga., 486; *Westcott* v. *Mitchell,* 95 Me. 377.

The legal principles just referred to make it apparent that, if there was a mistake in the contract, or rather, if the plaintiff was induced by a mutual mistake or a mistake on its part, accompanied by fraud on the part of the defendant, to enter into the contract as it was made, the contract was voidable on account of the mistake or fraud; and, although it was in writing, the parties could have so amended it as to avoid the results of the mistake, or so corrected it as to eliminate these results, by a subsequent, parol agreement; and that, if the president of the County Court had authority to bind it, by his agreement to make an adjustment on the basis of an allowance to the plaintiff, of the value of the work in excess of the contract price, there may have been a new contract, or rather a modification of the contract, so as to effectuate this result; unless effectuation thereof in such manner is precluded by the fact that the defendant is a public corporation. There was no lack of capacity in the defendant to make such a contract or to make it in the form in which it is claimed it was made. In some instances, the form of contract by which a public corporation may bind itself is prescribed by statute. In such cases, it can contract only in the mode prescribed. In the absence of such restrictions, however, it may contract as other corporations may. No particular formality is required. *Cade* v. *City of Belington,* 82 W. Va. 613; *Union Water Meter Co.* v. *New Martinsville,* 83 W. Va. 480. There is no statute prescribing the manner in which County Courts shall make such contracts as the one involved here.

Another vital inquiry is whether the president of the County Court, in ordering completion of the work and promising to make a satisfactory adjustment, bound the court. In this connection, it is not necessary to inquire whether he could have made an original contract for the work, on behalf of the corporation. Such a contract had already been formally made by the County Court, in the execution of which,

by reason of a misrepresentation on the part of one of its agents, right to impeach it on the ground of mistake or fraud, arose upon discovery thereof. Nor is it necessary to say he could directly bind the court, by a new contract. Municipal corporations are not immune from responsibility for injuries occasioned by fraud or mistake on the part of their agents or representatives, in procuring contracts. Such a corporation cannot profit by such a mistake or fraud made or perpetrated in connection with a written contract, any more than private individuals can. *Long* v. *Athol*, 196 Mass. 497; *McManus* v. *Philadelphia*, 211 Pa. 384; Dillion, Municipal Corporations, sec. 780; *Sharp* v. *Mayor etc.*, 40 Barb. (N. Y.) 256. By the original contract, the corporation had already bound itself, and incidentally made itself liable to the plaintiff, in some, way, by reason of the mistake or fraud of its agent. The president of the County Court had authority to receive binding notice of this liability, if nothing more. In other words, though he may not have had authority to enter into a new or modified contract, to relieve from the consequences of the mistake or fraud, his authority was clearly broad enough to enable the plaintiff to fix knowledge of the situation and the consequences of the agent's act, on the County Court, by the giving of notice thereof to him. Likewise, notice to him, of the intention of the contractor to go on with the work and to make a demand upon the corporation for compensation for the extra out-lay, was notice to it. As it was bound for the consequences of the mistake or fraud of the agent and was thus advised of the action, purpose and intent of the contractor, after discovery of the mistake, its acquiescence in the continuances and completion of the work, rather than any authority upon the part of the president to modify the contract on its behalf, constitutes the real basis of the plaintiff's alleged cause of action. After such notice, the corporation, by its acquiescence, continued to take the benefit of the plaintiff's expenditures or out-lay, in excess of what it would have bound itself to expend, in the absence of the mistake or fraud, and in excess of what it would have expended, but for such acquiescence after notice. In these circumstances, it is not

difficult to perceive all of the elements of a valid contract on the part of the corporation arising by implication, and it is well settled that a municipal corporation may bind itself in that way, just as other corporations may, in the absence of a statute limiting its powers to make contracts, in respect of form. *Cade* v. *City of Belington,* cited.

The only remaining inquiry respecting right of recovery, if it shall be found that the plaintiff has proved its case substantially as stated in its declaration, is the effect of the stipulation that the information upon which the plaintiff acted in entering into the contract was derived from personal investigation or research and that it would make no claim against the defendant by reason of estimates, tests or representations made by any of its officers or agents. Of a similar stipulation in the working contract, involved in *Hollenbach* v. *United States,* 233 U. S. 165, the Supreme Court of the United States, speaking through Mr. Justice Day, said: ''True the claimants might have penetrated the seven feet of soft, slushy sediment by means which would have discovered the log crib work filled with stones which was concealed below, but the specifications assured them of the character of the material, matter concerning which the Government might be presumed to speak with knowledge and authority. We think this positive statement of the specifications must be taken as true and binding upon the Government, and that upon it rather than the claimants must fall the loss resulting from such mistaken representations. We think it would be going quite too far to interpret the general language of the other paragraphs as requiring independent investigation of facts which the specification furnished by the Government as a basis of the contract left in no doubt. If the Government wished to leave the matter open for the independent investigation of the claimants it might have easily omitted the specification as to the character of the filling back of the dam. In its positive assertion of the nature of this much of the work it made a representation upon which the claimants had a right to rely without an investigation to prove its falsity.'' No state court stands higher in the estimation of the American bench and

bar, than the Supreme Judicial Court of Massachusetts, and that court, in a case exactly like this in its basic features, *Long* v. *Athol*, 196 Mass. 497, accorded right of rescission to the contractor, on the ground of mutual mistake. In the preparation of their bids, the contractors had access to the maps, drawing, profiles and specifications from which a skilled engineer could have made an accurate estimate of the quantities, depths of the excavation etc. Instead of having such estimate made, they relied upon one made and given out by the city's engineer, which was materially erroneous. This erroneous estimate was not recited nor embodied in the plans or specifications. It was simply furnished to the contractors on a separate and independent paper as a mere memorandum. The only difference between it and the representation charged here is that it was written while this one is verbal. And the contract contained a stipulation to the effect that the contractors had judged for themselves as to all conditions affecting the cost of performance of the work. This stipulation was relied upon as precluding relief, as a similar one is invoked here, by way of defense. As to it, the court held: "But the equitable right to rescind an agreement which has been entered into upon a mutual mistake as to material facts, knowledge of which would have prevented the parties from making it, is not to be defeated by reason merely of the stringency of the covenants which it contains." Nothing inconsistent with the conclusion here indicated is found in *Geary* v. *New Haven*, 76 Conn. 84. The decision in that case involved no more than interpretation of the contract which was found to have been free from mistake and fraud.

Upon the authorities above referred to, we hold that the stipulation in question does not preclude relief to a contractor who has been induced to make a highly disadvantageous contract, by a false representation as to the character of the work, made by an agent of a county court, verbally or in writing, whether in the plans and specifications or otherwise, if the consequences of the mistake so induced or the fraud so perpetrated, are so grave in their nature as to constitute ground for rescission of the contract. The stipulation must have

some limitations, else a contractor acting in the best of faith may be ruined by mere lack of extreme wariness. That is not required in any ordinary business transaction, and it cannot be assumed that the parties intended to introduce it by the use of the general terms in which the stipulation is expressed. If the case is as claimed by the plaintiff, in so far as it relates to the Roderfield contract, the agent knew the bidder was ignorant of the depths. If he had known them, he would not have made the inquiry. If the misrepresentation was made, with knowledge of its falsity and with intent to keep down the bid, the agent perpetrated a rank fraud. If he innocently made it without such intent, it operated as a fraud in law, because he had no right to make it under the circumstances. Enough has been said about the circumstances of the other contract to show that he may have acted fraudulently in procuring it, by means of the same representation. He was confronted by a new man ignorant of what had transpired and, concealing the known trap by his silence, took the contract from him. No contract ought to be so construed as to make it available as an instrument of fraud and oppression. If the agent had been unaware of the ignorance of the bidder, or, if he had declined to make a specific and positive statement, or had qualified his statement in view of his knowledge that the bidder was acting upon it, the situation would have been different, and might have called for a different conclusion. The stipulation is no doubt good against claims founded upon errors as to mere quantities, apparent conditions and trivial matters and mistakes as to graver matters made without knowledge that they are to operate as a material inducement to the contract. But it is not good as to a mutual mistake justifying rescission of the contract or a mistake coupled with fraud on the part of the agent acting for the County Court.

Weakness, shortness and indefiniteness in the evidence, some of which have been sufficiently indicated, however, clearly justified the action of the trial court, in setting aside the verdict. It does not appear when the work was commenced. Nobody gave the date on which the plaintiff got the plan for

the Negro Branch job.    Brast was not put on the stand to reveal the circumstances of the execution of the contracts, or to say whether he examined the plans.    There is no clear statement to the effect that the error as to the Negro Branch job was ever communicated to either Early or Eavenson, or that either knew it was complained of, or that completion of the work was ordered.    The fact that there were two contracts seems to have been overlooked in the trial.    Again the verdict was manifestly excessive.    No allowance could justly be made for increased cost due to a rise in wages, without regard to the long period of delay in the commencement of the work.    Thomas' illness was the misfortune of his company and could not be charged to the defendant.    Some of the excavations had to be cleaned out two or three times, after floods had filled them with sediment and debris.    If the work had been commenced in time and prosecuted with proper equipment and due diligence, there would have been less of that to do and possibly none.    The unexpected magnitude of the work may have caused some delay, but clearly not all of it, and when that was encountered, it called for a higher degree of diligence and better equipment, in view of the dangers incident to delay.

The judgment complained of will be affirmed.

*Affirmed.*