[Civ. No. 4788. Second Appellate District, Division Two.—January 21, 1925.]

## C. L. POWELL, Petitioner, v. R. M. ALLAN et al., Respondents.

[1] STREET LAW—IMPROVEMENT ACT OF 1913—UNSOLD BONDS—MEANING OF "ANY."—The words "any bonds" contained in the provision of section 30 of the Street Improvement Act of 1913 (Stats. 1913, p. 954) that any bonds not sold at the expiration of fifteen days after the advertisement of the sale provided for in the preceding section "shall be turned into" the special improvement fund, means "*all* bonds" not disposed of at the advertised sale.

[2] ID.—RIGHT OF CONTRACTOR TO UNSOLD BONDS—MANDATORY LEGISLATION.—The provisions of sections 30 and 33 of the Street Improvement Act of 1913 that all bonds not sold under section 29 of said act, and which are not used to reimburse the city or the contractor for advances to meet incidental expenses or awards of damages, "shall," upon the final acceptance of the work, "be issued to and received by the contractor in payment *pro tanto* of the contract price" of the improvement, are unequivocal and mandatory; and section 32 of said act does not leave it optional with the city to say whether the contractor shall or shall not receive any bonds in payment of the contract price.

[3] ID.—RECEIPT OF ACCRUED INTEREST — CONTRACT PRICE — PREMIUM FOR DELAY.—The fact that interest will accrue on said unsold bonds prior to the completion and acceptance of the improvement does not justify the argument that the contractor, by receiving said bonds together with the accrued interest thereon, shall be receiving more than the "contract price," as the contractor fixes the amount of his bid to meet all possible contingencies, including the possibility that when the work is accepted he will receive bonds upon which interest has accrued; nor does the fact that the contractor may receive the interest which has accrued upon the bonds at the time when the work is finally accepted necessarily afford a ground for the claim that if the statute be so construed the contractor will, in effect, be paid a premium for unreasonably delaying the completion of the improvement.

[4] ID.—INTEREST—PENALTY.—The interest provided for in connection with bonds issued under the Street Improvement Act of 1913 is not a charge for delinquency, or penalty, to which the city is entitled, but is simply compensation for the use or forbearance of money.

[5] ID.—RIGHT OF CITY TO RECEIVE BONDS—STATUTORY CONSTRUCTION —MEANING OF "ANY."—The provision of section 32 of the Street Improvement Act of 1913 that "in any event" it shall be com-

petent for the city to advance to the appropriate fund the par value of all or any part of the unsold bonds, in which case said bonds shall be issued to the city, and said city shall have the same rights in respect to the enforcement and collection thereof as other purchasers, should be read in conjunction with the subject matter of said section with which it is in immediate association, i e., the right of the city to receive unsold bonds to reimburse itself for advances to meet incident expenses or awards for damages, and the word "any," as used in the phrase "in any event," should be construed as synonymous with the word, "either," or as the equivalent of the term "any such," referring to the preceding events.

(1). 3 **C. J.**, p. 232, n. 33; 28 **Cyc.**, p. 1057, n. 37.   (2) 28 **Cyc.**, p. 1057, n. 37.   (3) 28 **Cyc.**, p. 1045, n. 5, p. 1057, n. 37.   (4) 25 **C. J.**, p. 1178, n. 6; 28 **Cyc.**, p. 1197, n. 32, p. 1208, n. 46, p. 1645, n. 71 New.   (5) 2 **C. J.**, p. 33, n. 29, 31; 3 **C. J.**, p. 230, n. 14, 18, p. 231, n. 19, 28, p. 246, n. 2 New; 28 **Cyc.**, p. 1057, n. 37.

PROCEEDING in Mandamus to compel the delivery to petitioner of certain street improvement bonds. Writ granted.

The facts are stated in the opinion of the court.

Emmet H. Wilson for Petitioner.

Jess E. Stephens, City Attorney, and Lucius P. Green, Assistant City Attorney, for Respondents.

FINLAYSON, P. J.—This is an original proceeding in *mandamus* to compel respondents, city officials of the city of Los Angeles, to deliver to petitioner certain street improvement bonds.

By proceedings regularly had under the Street Improvement Act of 1913 (Stats. 1913, p. 954), a written contract was entered into on April 2, 1920, between the city of Los Angeles and petitioner's assignor, one John Hayes, whereby the latter, as the contractor, undertook to construct for the sum of $995,773.21 a tunnel in the city of Los Angeles, commonly referred to as the Second Street tunnel. Thereafter assessments were levied upon the lots within the improvement district. Assessments equal in the aggregate to about one-half of the total amount assessed were paid in cash, and bonds were issued, at the election of the lot

owners, to represent the remaining assessments. The principal of the bonds amounted to the sum of $542,656.17. Work was commenced within twenty days after March 23, 1921, that being the date when the contractor received notice from the board of public works that there was sufficient money and bonds in the special fund devoted to the proposed improvement to pay the contract price. Numerous extensions of time were regularly granted for the performance of the work, which was finally completed some time in July, 1924, and prior to the expiration of the last extension of time. The improvement has since been accepted by the board of public works, and we may assume that it likewise has been accepted by the city council, for we are informed by respondents in their brief that the tunnel has been finally completed and is now open to public use. On January 9, 1922, Hayes assigned to petitioner all of his right, title, and interest in and to the moneys and bonds due or to become due under the contract.

On March 22, 1921, the bonds in the special fund devoted to the improvement were regularly offered for sale by the city, pursuant to proceedings had under section 29 of the act. It seems that at that time there was some question as to the validity of the bonds, due to certain litigation then pending wherein the legality of the proceeding was attacked, and the city succeeded in selling bonds only to the amount of $8,497.07, leaving unsold and in the special fund devoted to the improvement a large number of bonds, the aggregate par value of which is $534,159.10.

It never became necessary for the city to advance to the special improvement fund any money whatever to pay any incidental expenses in connection with the improvement, or to pay any of the awards of damages; and, in fact, the city never has made any such advances nor have any of the bonds ever been sold or used for the payment of incidental expenses or awards of damages.

It seems that the doubt which was cast upon the validity of the bonds by the litigation pending at the time when they were offered for sale was not finally removed until the supreme court of the United States, in a decision rendered March 3, 1924, ordered the dismissal of a certain action wherein the complainants had challenged the validity of the proceeding. Shortly after this decision, namely, on April

28, 1924, the city council, notwithstanding the fact that no money had ever been advanced to the special improvement fund by the municipality to pay for incidental expenses or for awards of damages, directed the city treasurer to transfer to such special fund from the reserve fund the sum of $534,159.10 in money, and to deliver to the city in exchange therefor the bonds which remained in the special fund after the sale of March 22, 1921, i. e., the bonds the aggregate par value of which amounts to the sum of $534,159.10. This action was taken by the city council upon the assumption that such exchange is authorized by section 32 of the Improvement Act. The city treasurer complied with the direction of the city's legislative body, and by reason thereof the municipality has ever since claimed to be the rightful owner of the bonds. Petitioner disputes the city's claim and has brought this proceeding to compel respondents to deliver the bonds to him. His contention is that by virtue of the statutory provisions presently to be mentioned the bonds should be treated as so much money in the special improvement fund, and that he, as the assignee of the contractor, became entitled to receive the bonds in payment *pro tanto* of the contract price of the improvement immediately upon final acceptance of the work.

The provisions of the Improvement Act bearing upon these respective claims are the following: No work is to be commenced by the contractor until assessments have been made on the lots in the improvement district and he has received written notice "that there is sufficient money or bonds or money and bonds in the special fund devoted to the proposed improvement to pay the contract price." (Sec. 9.) If bonds have been issued at the election of any of the property owners to represent the assessments against their lots, the city, after advertising the bonds for sale, may sell them, or any number of them, to the highest bidder for cash, and the "proceeds of the sale of such improvement bond shall be paid into the fund of the proceeding to represent assessments in which such bonds were issued." (Sec. 29.) The next section reads, in part, as follows: "Sec. 30. Any bonds not sold at the full expiration of fifteen days after the completion of the publication of the advertisement provided for in the preceding section shall be turned into the fund for the improvement for which the assessment is made, and shall be

deemed and treated as so much money in said fund, and
shall upon final acceptance of said improvement be issued
to and accepted by the contractor for the work, or his as-
signs, in payment *pro tanto* of the contract price of said
improvement, provided there is sufficient money in the said
fund to pay all incidental expenses and all awards of dam-
ages that must be paid prior to the doing of the work."
The remainder of the section relates to advances of money
by the contractor to the special improvement fund to pay
incidental expenses and awards of damages, when there is
not sufficient money in the fund for those purposes. Sec-
tion 32 reads: "The legislative body of any municipality
may, in its discretion, upon the failure of any contractor to
advance sufficient money to the fund devoted to any im-
provement to pay the incidental expenses and the awards
of damages as hereinabove provided, advance from the gen-
eral fund, or from such fund as said legislative body may
designate, to said fund the amount necessary for such pur-
poses. Whereupon the city treasurer shall issue to said city
bonds of the improvement in an amount equal at their par
value to the amount of money so advanced by the said city,
*and in any event* [italics ours] it shall be competent for the
city to advance to the appropriate fund the par value of all
or any part of said bonds, in which case the said bonds shall
be issued to the city, and the said city shall have the same
rights in respect to the enforcement and collection thereof
as other purchasers. Where the city advances money as in
this section provided, it shall have full authority at any time
to sell said bonds at a point acceptable to the legislative
body thereof." The italicized words "and in any event"
are those upon which respondents mainly rely to justify the
city's position. Section 33 is as follows: "Whenever the
contractor or the city has advanced to the appropriate fund
an amount sufficient to pay the incidental expenses and
awards, and has received bonds at their par value in an
amount equal to the sum so advanced, as hereinbefore pro-
vided, the bonds remaining shall be turned into said fund,
and shall be treated and regarded as so much money in said
fund, and shall upon final acceptance of the work be issued
to and received by the contractor in payment *pro tanto* of
the contract price of the said improvement."

We think it clear that unless the words of section 32 which we have italicized necessitate a different conclusion, there can be no question as to petitioner's right to receive the bonds and to apply them, at their par value, in payment *pro tanto* of the contract price of the improvement. The act, in section 29, makes provision for but one sale of bonds. [1] In section 30 the lawmakers expressly and specifically declare that "any bonds" not sold at the expiration of fifteen days after the advertisement of the sale provided for in the preceding section "shall be turned into" the special improvement fund. The words "*any* bonds," as here used, undoubtedly mean "*all* bonds" not disposed of at the advertised sale. There are instances, and this plainly is one of them, where the word "any" is properly construed to mean "all." See note to *State* v. *Kansas City*, Ann. Cas. 1916E, p. 8. [2] It further is provided in section 30 that the bonds so turned into the special fund at the expiration of fifteen days after the advertisement of sale "shall be deemed and treated as so much money in said fund," and that upon the final acceptance of the improvement the bonds thus turned into the special fund "shall . . . be issued to and accepted by the contractor for the work, or his assigns, in payment *pro tanto* of the contract price of said improvement," provided there is sufficient money in the special fund to pay all incidental expenses and all awards of damages. In the instant case there was sufficient money in the special improvement fund to make all such payments. By section 33 it likewise is expressly declared that if the contractor or the city shall have received bonds in an amount equal to any sum which he or it may have advanced to pay for incidental expenses or for awards, "the bonds remaining" shall be turned into the special improvement fund, shall be treated and regarded as so much money in said fund and "shall," upon the final acceptance of the work, "be issued to and received by the contractor in payment *pro tanto* of the contract price of said improvement." There is no uncertainty in this mandatory language. The two sections (30 and 33) declare unequivocally that any bonds not sold under section 29 of the act, and which are not used to reimburse the city or the contractor for advances made by it or him to meet incidental expenses or awards of damages, *shall* be issued to the contractor in payment *pro tanto* of the contract price.

Notwithstanding the plain and positive injunction contained in sections 30 and 33, respondents confidently assert that the language of these two sections leaves it optional with the city to say whether the contractor shall or shall not receive any bonds in payment of the contract price. We can perceive no merit in this claim, but because it has been made we shall consider its tenability before adverting to that part of section 32 upon which respondents mainly rely to sustain the city's claim to the bonds.

The imperative language of sections 30 and 33—the positive declaration that upon final acceptance of the work the bonds remaining in the special fund *shall* be issued to and received by the contractor in payment *pro tanto* of the contract price—would seem to be completely at variance with any notion of a privilege on the part of the city to deliver the bonds to the contractor or not, as it sees fit. [3] But respondents, stressing the use of the term "contract price" as employed in the provision to the effect that the contractor shall receive the bonds "in payment . . . of the contract price," argue that if interest has accrued upon the bonds prior to the completion and acceptance of the work, the contractor, if he receives the bonds at their par value in payment of the contract price, will receive, to the extent of such accrued interest, a sum over and above the "price" at which he contracted to do the work. This argument is more plausible than convincing. Where there is no question as to the validity of the bonds and they are readily salable in the market, the contractor, to the extent of the interest which has accrued on the bonds, will, it is true, receive a sum in excess of the amount named in his agreement as the contract price. But the bonds may be absolutely void, or, because of some real or supposed irregularity in the proceeding leading up to their issue, their marketability may be so far impaired that they can be sold only to speculators at sums much below their nominal value. But whether valid or invalid, questionable or unquestionable, the contractor not only must accept them in payment *pro tanto* of the contract price, but he must accept them at their nominal or par value. The statute enters into the contract and becomes a part of it. The bidders for the work are deemed to know this. Every bidder, therefore, doubtless fixes the amount of his bid with a view to the possibility that

he may be compelled to accept bonds in payment of a part at least of the contract price. It is true that whether the successful bidder shall be compelled to accept any bonds, and, if he shall be, what amount of bonds he may be compelled to take, are questions which lie in the misty realm of speculation and uncertainty at the time when the bids are made. But this very uncertainty, involving as it does the possibility that the successful bidder may be compelled to take worthless bonds for his work, affords all the more reason why he should, as he doubtless does, fix the amount of his bid to meet *all* possible contingencies, including the possibility that when the work is accepted he will receive bonds upon which interest has accrued.

Nor does the fact that the contractor may receive the interest which has accrued upon the bonds at the time when the work is finally accepted necessarily afford a ground for respondents' claim that if the statute be construed as contended for by petitioner the contractor will, in effect, be paid a premium for unreasonably delaying the completion of the improvement. All bonds issued to represent these local assessments draw interest from their date. (Sec. 25.) Therefore the contractor who is obliged to take bonds for his work will receive the same amount of interest whether he performs his work diligently or dilatorily—provided, of course, he has not forfeited his contract by reason of delay in its performance. By performing his work expeditiously and by promptly receiving his pay for it, whether that compensation take the form of money or bonds or of money and bonds, he may the sooner satisfy any interest-bearing obligations which he may have been compelled to incur in order to finance the job. By speedily completing the improvement he hastens the day when he can put an end to the running of the interest which he, as a borrower, may be obligated to pay. For this reason it is quite within the range of possibility that the motive which impels him to hasten the work will be the same whether he be paid in money or in bonds. Whether the motive is the same in either case is a matter depending largely upon the rate of interest at which he is able to borrow. If that interest be equal to or greater than the interest which the bonds draw, he may gain by completing the work as soon as possible and liquidating his debts with the money or bonds received by him in payment of the contract price.

There is a greater reason for holding that the statute should be construed as not giving to a city which has made no advances for incidental expenses or for awards of· damages the privilege of taking bonds at their par value thus enabling it to make a profit to the extent of the accrued interest, than there is for holding that the bonds with their accrued interest should not be delivered to the contractor in payment *pro tanto* of the contract price. The principle underlying special assessments to meet the cost of local improvements is that the property upon which they are imposed is peculiarly benefited, and that, therefore, the owners do not in fact pay anything in excess of what they receive by reason of the improvement. But the constitutional guaranties for the protection of private property would be seriously impaired if, under the guise of local assessments, the legislature should attempt to make the lot owners in a local improvement district contribute to the general revenue for the use of the public at large. (*Norwood* v. *Baker*, 172 U. S. 269 [43 L. Ed. 443, 19 Sup. Ct. Rep. 187, see, also, Rose's U. S. Notes].) In *McCormack* v. *Patchin*, 53 Mo. 36 [14 Am. Rep. 440], the supreme court· of Missouri says: "The whole theory of local taxation or assessments is that the improvements for which they are levied afford a remuneration in the way of benefits. A law which would attempt to make one person or a given number of persons, under the guise of local assessments, pay a general revenue for the public at large, would not be an exercise of the taxing power but an act of confiscation." Every assessment levied under the provisions of this Street Improvement Act must include its proportion of the total amount of incidental expenses necessarily incurred by the city in connection with the proposed improvement. (Sec. 10 and subd. 6 of sec. 46.) If by reason· of the· issuance of bonds there be any expense to the city which is not included within the statute's definition of the term "incidental expenses," it must, as a general rule, be a trifling sum as compared with the amount of° interest which may accrue upon the bonds prior to the city's acceptance of the improvement. If, therefore, the city, without having made any advances for incidental expenses or for awards, but at its option and at any time before the final acceptance of the work, may transfer from its general fund to the special street improvement

fund a sum of money equal only to the par value of the street improvement bonds remaining in the latter fund, receiving such bonds in return for the moneys so transferred by it, and if, as in the instant case, the validity of the bonds has been determined beyond peradventure, then the accrued interest represents a very considerable profit to the city—a sum of money which the property owners paid into the city treasury for a purely local improvement, and which, therefore, could very properly be paid to the contractor as a part of the cost of the improvement. But if in such case the city receives the accrued interest the profit which it makes out of the transaction will not be used by it to defray any part of the cost of the local improvement for which it was paid. On the contrary, if the profit be retained by the city it may be used by it for any of the numerous purposes to which the municipality's general revenue is devoted. A construction of the statute which permits this to be done opens up a grave constitutional question which, if we do not find it necessary to decide, must at least give us pause. We do not decide it, simply because we think the language of sections 30 and 33 is too plain to permit the construction which respondents seek to place upon it.

[4] It cannot successfully be claimed that the interest provided for in the bonds is of the nature of a "penalty" to which the city is entitled simply because it is a penalty. Where, under the guise of "interest," a sum is exacted of a *delinquent* property owner, such sum, though denominated "interest," is in fact a penalty—as was held by the Oregon supreme court in *Colby* v. *Medford*, 85 Or. 485 [167 Pac. 487]. There the court said that "when interest is charged on a delinquent tax, it is not regarded as interest in the sense that it is a consideration for the forbearance of money, but it is deemed to be a penalty." But the "interest" provided for in these street improvement bonds is not a charge for delinquency. No part of a bond is delinquent until the lot owner has defaulted in the payment of the principal or interest of the bond after it has become due. When that happens the statute makes specific provision for the only "penalties" which are imposed by reason of such default. (Sec. 34 et seq.) Therefore the interest which is provided for by these bonds—interest which runs from the date of each bond—is interest in the true sense of the term, i. e., it

is compensation for the use or forbearance of money, and as such is distinguished from a penalty, which is a punishment. (*In re Ashland Emery etc. Co.,* 229 Fed. 829; *Sparks* v. *Lowndes County,* 98 Ga. 284 [25 S. E. 426]; *Shmuck* v. *Wheeler,* 98 Wash. 535 [167 Pac. 1126]; 25 C. J. 1178; Civ. Code, sec. 1915.) Clearly it was not the intention of the legislature to punish the property owner simply because he sought to avail himself of the statutory privilege of having a bond issue to represent the assessment against his lot.

Our conclusion from the foregoing is that if sections 30 and 33 stood alone, petitioner, without doubt, would possess the unconditional right to receive the bonds in payment *pro tanto* of the contract price. [5] Having arrived at this conclusion, we shall now consider whether there is anything in the language of section 32 which justifies the city's position. That section, after declaring, in substance, that the city may advance money to the special street improvement fund for the purpose of paying incidental expenses and awards of damages if the contractor has failed to make such advances, and that the city treasurer shall issue bonds to the city equal, at their par value, to the amount so advanced by the city for incidental expenses or awards, goes on to say: " . . . and in *any* event [italics ours] it shall be competent for the city to advance to the appropriate fund the par value of all or any part of said bonds, in which case the said bonds shall be issued to the city, and the said city shall have the same rights in respect to the enforcement and collection thereof as other purchasers." Respondents claim that this language is broad enough to justify the city in making advances of money to the special fund in exchange for bonds in "any" event, and quite regardless of whether the advances were made by it for the specific purpose of paying incidental expenses or awards of damages. This might be true if the general words "in any event" were not used in connection with a very definite subject matter and in immediate association with language of much narrower import. In this section of the act the legislature is dealing with "advances" to meet incidental expenses and awards. As respondents construe the section, the city is in effect not merely empowered to make advances but is authorized to "purchase" the bonds outright, just as any purchaser might do at a sale held under

70 Cal. App.—43

section 29 of the act. If that had been the intention the legislature, we may presume, would have employed more appropriate language to express the intent. But here the language is that it shall be proper for the city to "advance" to the appropriate fund an amount equal to the par value of the bonds. An "advance" is something which precedes. "To advance money is to pay it before it is due, *or to furnish it for a certain specific purpose,* with the understanding that it, or some equivalent, is to be returned." (*Ebeling* v. *Ebeling,* 61 Misc. Rep. 539 [115 N. Y. Supp. 895]. Italics ours.) Without doubt, the word "advance," as used in this section of the act, means, "to furnish for a certain specified purpose." The payment of incidental expenses or of awards of damages, or both, is the only purpose for which money could possibly be furnished by the city for use in the special fund to which the advances are made. We may safely conclude, therefore, that advances of money for such limited purposes constitute the subject matter of the section.

"Any" is a word which may have one of several meanings, according to the subject which it qualifies. Like all other general words, its meaning is often restrained and limited by the context or subject matter. In *Barber* v. *Morgan,* 89 Conn. 583 [Ann. Cas. 1916E, 102, 94 Atl. 984] it is held that a statute providing that "every such corporation" may increase or reduce its capital stock and the number and par value of its shares, and that in case of a reduction of the capital stock of "*any* corporation" by any mode which shall render it insolvent, the stockholders assenting thereto shall be liable for the debts of the corporation, applies only to joint stock corporations, and the words "any corporation" must be limited to joint stock corporations. There the court says: "What corporations did the legislature have in mind when they used the words 'Any corporation'? Naturally joint stock corporations with which they were dealing, and for the reduction of whose stock provision was made in the same section and sentence in which these words are found. Clearly by 'any corporation' was intended any *such* corporation [italics ours], and the general words must be limited to that meaning." In *Richardson* v. *Ainsa,* 218 U. S. 289 [54 L. Ed. 1044, 31 Sup. Ct. Rep. 23, see, also, Rose's U. S. Notes], the United States supreme court, construing an

act of Congress, gave to the general words "in any case—
words which are synonymous with the term "in any event
—a limited scope and meaning in harmony with reason and
with the evident purpose of Congress as disclosed by its
entire legislation upon the subject. In *United States* v.
*Hom Hing*, 48 Fed. 635, the court had occasion to con-
strue an act of Congress which provides that "in any case
where it is necessary in order to prevent a failure or delay
of justice, any of the courts of the United States may grant
a *dedimus potestatem* to take depositions according to com-
mon usage." The court held that the words "in any case"
do not mean broadly any case where one of the parties to a
controversy desires the evidence of a foreign witness, but
any case of which the court granting the commission has
jurisdiction. For other cases in which the word "any"
has been restricted to the subject matter of the statute, or
to the subject matter of the particular section or clause in
which it occurs, see *Indiana etc. Coal Co.* v. *Neal*, 166 Ind.
458 [9 Ann. Cas. 424, 77 N. E. 850]. Also *In re Licenses*
(Iowa), 179 N. W. 609, and the cases there cited.

Not infrequently the word "any" has been construed in ac-
cordance with the *ejusdem generis* doctrine. (3 C. J. 231.)
"It may be admitted," says the federal supreme court in
*United States* v. *Bitty*, 208 U. S. 402 [52 L. Ed. 543, 28 Sup.
Ct. Rep. 398, see, also, Rose's U. S. Notes], "that, in accord-
ance with the familiar rule *ejusdem generis*, the immoral pur-
pose referred to by the words 'any other immoral purpose'
must be one of the same general class or kind as the par-
ticular purpose of 'prostitution' specified in the same clause
of the statute." In *Hubbel* v. *Higgins*, 148 Iowa, 36 [Ann.
Cas. 1912B, 822, 126 N. W. 914], it was held that a statute
providing that all hotels be kept and maintained in a clean
and sanitary condition, free from any effluvia, gas, or
offensive odors arising from any sewer, drain, or privy,
"or from *any other* source whatever" within the control of
the owner, manager, or person in charge, does not confer
on the hotel inspector arbitrary power to declare a nuisance
solely because of "offensive odors," since, under the rule
*ejusdem generis*, the words, "any other source whatever"
refer to a source of like kind with "sewer, drain and privy."
See, also, *Ex parte Neet*, 157 Mo. 527 [80 Am. St. Rep. 638,
57 S. W. 1025].

It has been held that "any" should be construed as synonymous with "either" whenever it is necessary to do so in order to prevent destroying the evident intention of the legislature. (*Fenet* v. *McCuiston*, 105 Tex. 299, 303 [147 S. W. 867]; *Dowling* v. *State*, 5 Smedes & M. (Miss.) 664; *State* v. *Antonio*, 2 Tread. Const. (S. C.) 776, 783; 3 C. J., p. 231; 1 Words & Phrases, p. 414; note to *State* v. *Kansas City*, Ann. Cas. 1916E, p. 11.)

We think that the word "any," as used in the phrase "in any event" in section 32 of this act, should be construed as synonymous with the word "either," or as the equivalent of the term "any such," and that when the legislature said that "in any event" it shall be competent for the city to *advance* money to the special fund in exchange for bonds, it had in mind that if it became necessary for the city to advance money to that fund for the purpose of paying incidental expenses or awards of damages, or both, then and in *either* of those events, or in any *such* event; it would be competent for the city to make the advances and to receive bonds in exchange. Any other construction would bring this section into irreconcilable conflict with sections 30 and 33, and we would be confronted with a situation as absurd as that involved in the hypothetical case of an irresistible force meeting with an immovable body. It cannot be presumed that in adopting section 32 the legislature intended to destroy the evident meaning of sections 30 and 33.

Our conclusion is that petitioner's interpretation of this statute is correct, and that, therefore, upon the final acceptance of the work he became entitled to receive all of the bonds which were in the special improvement fund immediately prior to the action taken by the city on April 28, 1924—the bonds to be accepted by petitioner at their par value in payment *pro tanto* of the contract price.

Let the peremptory writ of mandate issue.

Works, J., and Craig, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on March 20, 1925.

Myers, C. J., and Seawell, J., dissented from the order denying a hearing in the supreme court.