MARTHA BROWN CONLEY, *et al.*

*v.*

DR. GEORGE W. EASLEY

(No. 10384)

Submitted September 26, 1951. Decided December 11, 1951.

Lovins and GIVEN, JUDGES, dissenting

*Bronson & Bronson* and *William B. Hogg,* for appellants.

*Lafe B. Chafin,* for appellee.

Fox, PRESIDENT:

On the first day of July, 1943, Martha Brown Conley, in her own right and as widow and executrix of her husband, George Thomas Conley, deceased, and Ella Salton, in her own right and as administratrix of her husband, R. A. Salton, deceased, Russel A. Salton, Jr. and Virginia Salton Yost, and John W. Yost, her husband, as lessors, entered into a lease agreement with Dr. George W. Easley, leasing to said Easley what is known as the Williamson Memorial Hospital, located in the City of Williamson, West Virginia, for a term of three years, at a monthly rental of $3,400.00. The lease was extended, under the terms thereof, for three years, and made to end on the 30th of June, 1949. Paragraph 12 of the lease, out of which grows this litigation, reads as follows:

> "The Lessee covenants and agrees that if the Lessors, or the Williamson Memorial Hospital, late a corporation, or its Trustee if it be dissolved, shall so desire, then that he, the Lessee, will undertake to collect any accounts and bills receivable, due unto the corporation as of July 1, 1943, on the following terms and conditions:
>
> "(a) The accounts and demands to be assigned without warranty and without recourse in law or in equity to the Lessee.
>
> "(b) The Lessee will make demand for, and receive from the debtors, such funds as they may be induced to pay, on account of the accounts and bills receivable.

"(c) The Lessee will keep a separate account of the funds so received, and shall be permitted to appropriate and use such funds, for himself.

"(d) The Lessee will pay off and discharge the accounts for merchandise or labor, due or owing by the corporation on July 1, 1943, and keep an account thereof.

"(e) At the expiration of the Lease, original or as extended, the Lessee will, in turn, assign unto the Lessors, or their nominee, any bills or accounts receivable which may be owing unto him, in an amount not less than the amount of the bills and accounts receivable, hereby assigned or to be assigned unto him, as hereinbefore recited. The writing of assignment shall be without warranty as to the validity of the demands, and without recourse either in law or in equity as to the assignor; in which event the assignees of the Lessee shall assume the payment of such amounts as the said Lessee shall be owing on account of labor and supplies, but the amount so assumed by the Lessors shall not exceed the amount paid out by the Lessee, as provided in paragraph (d)."

The following facts, in relation to the accounts and other matters mentioned in the paragraph quoted above, are admitted. One: At the beginning of the said lease, the accounts which Dr. Easley was permitted to collect and use amounted to the sum of $114,714.85, of which Easley collected the sum of $15,489.94; Second: The aggregate of bills owing by the hospital, all of which Easley was required to pay under the provisions of Paragraph 12, was $5,050.59, leaving a balance which Dr. Easley was entitled to use as his own of $10,439.35; Three: The amount of uncollected accounts of those assigned to Dr. Easley, at the beginning of his lease, was, on June 30, 1949, the date when he surrendered the same, $99,224.91; Fourth: The amount of additional uncollected accounts which accumulated during the six years Dr. Easley operated said hospital, under his lease, was $124,204.83; and Five: The amount of the bills which the hospital owed to various persons, on June 30, 1949, was $7,061.43.

The matter in dispute, and it is a legitimate matter of

controversy coming within the declaratory judgment act hereinafter mentioned, is the respective rights of the lessors and the lessee under the lease of July 1, 1943, to the uncollected accounts existing on June 30, 1949, the date when Easley surrendered the hospital to his lessors. The contention of the lessors is that the accounts in their entirety belonged to them; the contention of the lessee, Easley, is that he is entitled to said accounts. As between these parties, there does not seem to be any middle ground, neither party yielding to the other on account of any equities involved by reason of the nature of the accounts, their collectability or otherwise.

This is a declaratory judgment proceeding under the provisions of Chapter 26, Acts of the Legislature, 1941, and, as stated above, the controversy is one which comes within the act. The facts as narrated above are set up in what is termed a bill of complaint in which the lessors in the lease of July 1, 1943, and Woodrow W. Scott and Russel A. Salton, Jr. are made plaintiffs, the latter by reason of their being the present lessees of the hospital, and being interested in the accounts involved, and Dr. George W. Easley, defendant. Defendant filed his answer and crossbill in which he sets up his claim to the said accounts. The case was heard upon the bill and the answer and crossbill, and on October 27, 1950, the court rendered a written opinion in the case which is made a part of the record, and entered the following judgment:

"IT IS, THEREFORE, ADJUDGED, ORDERED AND DECREED:

"1. That the accounts receivable owing to the Williamson Memorial Hospital as of June 30, 1949, which accounts are of the total sum of $223,-429.94 according to the audit made by T. R. Joseph and filed as an exhibit with the defendant's answer, belong to and are the property of the defendant, Dr. George W. Easley.

"2. That the defendant, Dr. George W. Easley, shall account to the plaintiffs in the sum of $10,-439.35, payable out of the monies collected out of the accounts receivable as of June 30, 1949, and

further that the defendant, Dr. George W. Easley, shall account to the plaintiffs in the sum of $7,-061.43, which is likewise to be paid out of the said accounts receivable or those collected by the plaintiffs; making a total sum of $17,500.78 to be accounted for by the defendant to the plaintiffs, payable out of the said accounts receivable owing to the Williamson Memorial Hospital as of June 30, 1949. Any balance collected on said accounts receivable, after payment of said sum of $17,500.78 to the plaintiffs, shall be paid to the defendant, Dr. George W. Easley, and the balance of the accounts receivable, as of June 30, 1949, not collected, shall be turned over and delivered to Dr. George W. Easley as and for his own property. And that after the plaintiffs shall have collected the total sum of $17,500.78 out of said accounts receivable, they shall then turn over to the defendant all the remaining unpaid accounts receivable as of June 30, 1949."

On March 19, 1941, at the instance of the plaintiffs, we granted this appeal.

The majority of the Court is of the opinion that there is no sound basis for the decision of the trial court. That decision completely ignores the express provision of Paragraph 12 of the lease in respect to accounts, and is based upon what the chancellor believed to be the equities of the situation. Not having before us the information as to the amount of the accounts which have been collected since June 30, 1949, by the present lessees, or the other plaintiffs, we are in no position to deal with the equities of the case, even if we were permitted to do so. We think, however that we are not permitted to depart from the terms of the agreement between the parties, and should, so far as possible to do so, enter a decree within the frame work of the written agreement the parties made, and in so doing we must deal with the accounts which were the subject of that agreement.

At this point, the Court is unable to agree upon a solution of the case. Two members of the Court would affirm the judgment of the trial court, and two would reverse the trial court, and remand the case with directions

to enter a decree sustaining the contention of the plaintiffs in toto. The position of the writer of this opinion is to reverse the decree of the trial court, and remand the cause with directions to enter a decree based upon the principles which I will endeavor to state.

It seems to me that the whole controversy may be equitably determined, within the terms of the agreement, by disposing of two questions: First, what accounts should we take into consideration; and, second, whether the reference contained in Subsection (e) of Paragraph 12 of the lease agreement was intended as a limitation on the amount of the accounts which the lessee should return to the lessors when he surrendered his lease. In my opinion, the $99,224.91 accounts remaining uncollected from those turned over to Easley, on July 1, 1943, should no longer be considered, and they should remain the property of Easley. I think we would be justified in taking this course, because they are barred by the statute of limitations, and the passage of time, and the small amount collected during the period of six years indicates that they have no value. Certainly it was not contemplated in the agreement that Easley could turn over an equivalent amount of accounts by using these worthless accounts to make up the total of the sum required to be assigned to the lessors at the termination of his lease. There is nothing in the agreement that prevents us from eliminating from any present consideration the accounts aggregating $99,224.91 which are treated as of no value. I think the situation before us warrants us in so doing. Therefore, I think what we are dealing with is the $124,204.83 of accounts which were accumulated under Dr. Easley's administration of the hospital. Some of these accounts may be barred by the statute of limitations; others may be collectible; but they are of the same general character of accounts as those received by Easley in 1943, when he took charge of the hospital.

We then come to the important question in the case as to what accounts were to be turned over by Easley to his lessors on the termination of his lease. I have

been impressed with the ingenuity of counsel in avoiding a discussion of the entire first sentence of section (e) of Paragraph 12 of the lease. This reads:

> "At the expiration of the Lease, original or as extended, the Lessee will, in turn, assign unto the Lessors, or their nominee, any bills or accounts receivable which may be owing unto him, *in an amount not less than the amount of the bills and accounts receivable, hereby assigned or to be assigned unto him, as hereinbefore recited. \* \* \*"* (Emphasis ours.)

The amount of the bills and accounts which Easley took over was $114,714.85, as afterwards determined by an accounting, recognized as correct by all parties. Clearly, the underscored portion of the quotation above refers to, and, in my opinion, limits the amount of the accounts which Easley was required to assign. What the parties had in mind was to place the owners of the property in the same position as they were in when the lease was made in July, 1943. To show that this is true, the same section provides:

> "\* \* \* in which event [referring to the same amount of accounts] the assignees of the Lessee shall assume the payment of such amounts as the said Lessee shall be owing on account of labor and supplies, but the amount so assumed by the Lessors shall not exceed the amount paid out by the Lessee, as provided in paragraph (d)."

As a matter of fact, the accounts which were due from the hospital to various persons at the time Easley surrendered his lease was $7,061.43; therefore, if Easley be required to turn over from the accounts accumulated during his administration of the hospital the sum of $114,714.85, the hospital would only have been required, under the terms of the lease, to pay the bills accruing under Easley's administration to the amount of $5,050.59, leaving Easley to pay the difference between that amount and the total amount of said bills. That solution of the matter would leave the parties in exactly the same position as they were in in July, 1943, save and except a question which we have no way of determining, and that

is the comparative value of the accounts which were turned over to Easley, and the value of those to be assigned to the lessors, or their nominee, at the end of his administration under the lease agreement. That element of the case renders the contract difficult to enforce in any equitable way, and if this Court should feel itself free to define an equitable basis for the settlement of the accounts, the case would have to be further developed by an ascertainment of the relative value of the accounts which had accumulated to the date when Easley took over the hospital in 1943, and those which accumulated during the six years of his administration.

If we are to decide this case on the record as now presented, it seems to me that we must give recognition to the provision of Subsection (e) of Paragraph 12 of the lease, which, in plain language, requires the lessee, at the expiration of his lease, to assign to the lessors, or their nominee, any bills or accounts which may be owing to him in an amount not less than the bills and accounts which had been assigned to him at the time he entered on his lease in 1943, which was the sum of $114,714.85. My disagreement with the two members of the Court, who would hold that all of these accounts which had been accumulated by Easley, as well as those which had been assigned to him when he took over the lease in 1943, now belong to the plaintiffs, is that I think it was plainly intended to require only that Easley should assign accounts to the amount of those which had been assigned to him. I am not willing to go further than to place the present owners, and present lessees, in the same position in which Easley stood when he took over the lease in 1943, and I think this was the plain intention of those who entered into the lease. If that had not been intended, there was no occasion whatever for the use of the language "in an amount not less than the amount of the bills and accounts receivable, hereby assigned or to be assigned unto him, as hereinbefore recited." If it had been intended that Easley should assign all these accounts, the provisions of Subsection (e) should have ended at the point where the language immediately above

quoted began. In other words, the provision would have simply been: "At the expiration of the Lease, original or as extended, the Lessee will, in turn, assign unto the Lessors, or their nominee, any bills or accounts receivable which may be owing unto him, * * *." If that language had been used, this controversy could not have arisen. The language immediately following was added and it must have been added for some purpose, and this purpose must have been to limit the amount of the accounts which Easley was to assign.

The question may be asked, how are we to make a division of accounts, as between the plaintiffs and the defendant, constituting the difference between the total of the accounts, accruing under the terms of Easley's lease, $124,204.83, and the sum of $114,714.85, the aggregate of the accounts turned over to Easley in 1943, that difference being $9,489.98. Someone may inquire as to what accounts should be turned over to Easley. My solution of this case on this point would be to require Easley to turn over all of these accounts to the plaintiffs, on the condition that there be paid to him, from collections thereof, the sum of $9,489.98. I would require that upon the assignment of these accounts by Easley, the plaintiffs pay, on account of the bills of the hospital existing at the conclusion of Easley's administration thereof, the sum of $5,050.59, which would, of course, leave Easley the burden of paying the balance between that sum and the aggregate of the said bills which was $7,061.43. I agree, of course, that there should not be a separation of the accounts, but it is not necessary that any such method be employed. Certainly a court of equity in determining an intricate matter of this character may make a money decree of the nature I have suggested.

In the situation presented by the inability of the majority of the Court to agree upon any final solution of the matters in controversy, but a majority of the Court being of the opinion to reverse the decree of the Circuit Court of Mingo County, the same is reversed, and the

case remanded for further development and consideration by that court.

*Reversed and remanded.*

HAYMOND, JUDGE:

I concur in the syllabus, as prepared by Judge Fox, which reverses the judgment of the Circuit Court of Mingo County and remands this proceeding to that court for further consideration. I do not, however, agree with the views expressed in the opinion filed by him with respect to the amount of the accounts to be assigned by the defendant to the plaintiffs, or the reasons stated by him in determining such amount, or the division which he would make of the proceeds of the accounts between the respective parties. Any method, such as that indicated by Judge Fox, or that adopted by the circuit court in its final judgment, by which the amount of the accounts, existing at the termination of the lease, is limited or reduced, except to the extent necessary to pay from them the amount of $5,050.59 on the bills incurred by the defendant, disregards and departs from the plain and unambiguous provision of the lease relating to the accounts and substitutes a provision entirely different from that agreed to by the parties themselves. In short, Judge Fox, as I understand his opinion, would modify or rewrite the contract of the parties, to the extent necessary to conform to his idea of a fair and equitable contract between them instead of giving full force and effect to the clear and express terms of the contract which, upon full consideration, they themselves entered into and adopted. To that disposition of this case I can not agree, for the reason that it would violate the sound principles of law governing the interpretation of written contracts which are clearly stated in 12 Am. Jur., Contracts, Section 228, in this language: "Interpretation of an agreement does not include its modification or the creation of a new or different one. A court is not at liberty to revise an agreement while professing to construe it. Nor does it have the right to make a contract for the parties—that is, a contract different from that actually entered into by them. Neither abstract justice nor the rule of liberal construction justifies the creation of a contract

for the parties which they did not make themselves or the imposition upon one party to a contract of an obligation not assumed. Courts cannot make for the parties better agreements than they themselves have been satisfied to make or rewrite contracts because they operate harshly or inequitably as to one of the parties. If the parties to a contract adopt a provision which contravenes no principle of public policy and contains no element of ambiguity, the courts have no right, by a process of interpretation, to relieve one of them from disadvantageous terms which he has actually made."

The judgment entered by the able and experienced judge of the circuit court, based on his obvious desire and effort to do what he considers equity between the parties, changes and rewrites the provision of the contract to an even greater extent than the opinion of Judge Fox indicates that he would do. As the judgment of the circuit court departs from the applicable provision of the contract, it is clearly erroneous and should be reversed. 12 Am. Jur., Contracts, Section 228.

As stated in the opinion of Judge Fox paragraph 12 (e) of the lease contains this provision:

"(e) At the expiration of the lease, original or as extended, the Lessee will, in turn, assign unto the Lessors, or their nominee, any bills or accounts receivable which may be owing unto him, in an amount not less than the amount of the bills and accounts receivable, hereby assigned or to be assigned unto him, as hereinbefore recited. The writing of assignment shall be without warranty as to the validity of the demands, and without recourse either in law or in equity as to the assignor; in which event the assignees of the Lessee shall assume the payment of such amounts as the said Lessee shall be owing on account of labor and supplies, but the amount so assumed by the Lessors shall not exceed the amount paid out by the Lessee, as provided in paragraph (d)."

The subsection of the paragraph just quoted is free from ambiguity and its meaning, it seems to me, is entirely clear. It means, first, that the accounts owing to the lessee, the defendant, at the expiration of the lease,

shall be assigned to the lessors or their nominee. It is clear, also, that the words "any bills or accounts" mean all the accounts owing to the lessee at that time. In its broad sense the word "any" means "every" or "all". 3 C. J. S., Any, pages 1400 and 1401. See *Roedler* v. *Vandalia Bus Lines,* 281 Ill. App. 520; *Newcomb* v. *Kloeblen,* 77 N. J. L. 791, 74 A. 511, 39 L. R. A., N. S., 724; *West Jersey Traction Company* v. *Camden Horse Railway Company,* 52 N. J. Eq. 452, 29 A. 333; *West Jersey Traction Company* v. *Camden Horse Railway Company,* 53 N. J. Eq. 163, 35 A. 49; *Powell* v. *Allan,* 70 Cal. App. 663, 234 P. 339; *Southern Railway Company* v. *Gaston County,* 200 N. C. 780, 158 S. E. 481. The words immediately following "in an amount not less than the amount of the bills and accounts receivable, hereby assigned or to be assigned unto him, as hereinbefore recited." mean that the lessee shall carry bills and accounts receivable in an amount not less than the amount of the bills and accounts receivable assigned to him, which was the sum of $114,714.85. It is evident from the lease in its entirety that the parties intended that the unpaid accounts receivable, then assigned by the lease, should be collected and used by the lessee as capital assets in a continuing fund to enable him to operate the hospital and pay the expenses incurred from time to time in its operation, and that the accounts receivable existing at its termination, after deducting the amount of the debts of the lessors, which were paid by the lessee, and which then amounted to $5,050.59, should "in turn" be assigned by the lessee to the lessors or their nominee to be used by them or their assignee in the operation of the hospital as they were used by the lessee.

The words relating to the accounts receivable "in an amount not less than the amount of the bills and accounts receivable, hereby assigned or to be assigned" to the lessee, mean exactly what they say, and they mean that the lessee should have bills and accounts receivable, at the end of the lease "in an amount not less than" $114,-714.85, which was the amount of the accounts receivable assigned to him. They do not mean, as Judge Fox ap-

parently considers them to mean, that the accounts receivable to be assigned should be "equal to" or "not to exceed" or "limited to" $114,714.85, the amount of the accounts receivable assigned to the lessee. They clearly place a limit on the minimum amount of the accounts receivable but just as clearly they do not limit the maximum amount of the accounts receivable if they should, as they actually did, exceed the amount of $114,714.85, at the termination of the lease. By acquiring and holding accounts receivable owing to him in the amount of $223,429.94, the lessee has satisfied the requirement that the accounts receivable should be "in an amount not less than the amount of the bills and accounts receivable" assigned to him, and as the lease imposed no limitation on the amount of the accounts receivable to be assigned by him in excess of $114,714.85 and required him to assign "any bills or accounts receivable which may be owing unto him", which at the termination of the lease amounted to $223,429.94, the lessee is required to assign them in that amount to the lessors or their nominee, subject to the provision that they should assume "the payment of such amounts as the said Lessee shall be owing on account of labor and supplies, but the amount so assumed by the Lessors shall not exceed the amount paid out by the Lessee, as provided in paragraph (d)", which amount was the sum of $5,050.59. The plainly expressed intention of the parties to the lease is that all the accounts receivable at the termination of the lease should be assigned to the lessors, or their nominee, and that the amount of such accounts should not be less than the amount of the accounts when the lease was made which was $114,714.85.

It is clear to me that the parties to the lease, by the terms of paragraph (e), intended to impose a minimum amount, but not a maximum amount, of the accounts receivable to be assigned at the termination of the lease, and did not impose the requirement that the accounts receivable to be assigned should be "equal to" or should not "exceed" the amount of the accounts receivable assigned to the lessee. If they had so intended they easily

could, and no doubt would, have stated in the lease that the accounts receivable to be assigned should "equal" or "not exceed" the amount assigned to the lessee. Instead they used the words "in an amount not less than the amount of the" accounts receivable assigned to the lessee, which have a distinct and contrary meaning from that of either of the suggested expressions that could have been used. The words "in an amount not less than" do not mean "in an amount equal to" or "in an amount not to exceed"; and no sound or justifiable interpretation can give them any such meaning or effect. It is significant too, and, I think, sustains the view I have indicated of the meaning of the provision, that in limiting the amount assumed by the lessors, the language is "but the amount so assumed by the Lessors shall *not exceed* the amount paid out by the Lessee." instead of the words "in an amount not less than" the amount paid by him. (Emphasis supplied). The use of these different phrases in the same short subsection of the paragraph of the lease clearly shows that they were intended to have a different, and not the same, meaning or effect.

The meaning which I would place upon the language of subsection (e) of the paragraph gives effect to each of its words when used in its common and usual sense and significance, and accords with the well established rule that words of an unambiguous written contract should be given their ordinary, usual and commonly accepted meaning and significance when it does not appear that they are used in a different sense or that such meaning will produce an absurd or unreasonable result. 12 Am. Jur., Contracts, Section 236; *Farber* v. *Mutual Life Insurance Company*, 250 Mass. 250, 145 N. E. 535, 36 A. L. R. 806. It also avoids the confusion and the uncertainty which would necessarily result from any attempt to divide or distribute the accounts receivable, or their proceeds when collected, between the plaintiffs and the defendant which, it seems to me, must be done if the views expressed by Judge Fox in his opinion should be followed. In my judgment there is no way, except by agreement between the parties, who are unwilling to

agree, by which any fair or practical division of the accounts can be accomplished. If all the accounts receivable are not required to be assigned by the lessee, as provided by the lease, subject to the assumption by the lessors of the limited amount paid by the lessee for labor and supplies, some division of the accounts, or their proceeds as and when collected, between the parties is the only other alternative to dispose of them. It is manifest to me, however, that no such division was intended by the parties to the lease, for which it fails to make provision, and that, under the contract, such accounts can not be divided or distributed between parties claiming any part of them on any equal valuation basis, or otherwise, or collected by the lessee, or assigned to the lessors to be collected, and their proceeds divided between them and the lessee. The undesirability of any division or distribution of the different accounts receivable, or their proceeds, in any fixed or determinable amount was no doubt recognized by the parties to the lease who, by omitting from the .contract any provision to that effect, indicated clearly that they did not desire or intend that any such division or distribution of the accounts or their proceeds should be made or undertaken in connection with the assignment of the accounts by the lessee. On the contrary they intended to avoid a situation which would render necessary any division or distribution of the accounts receivable or their proceeds among them or their successors. Moreover, the case as presented in the circuit court, and as it now stands in this Court, admittedly has not been developed to the extent necessary to permit any attempt to divide or distribute the accounts receivable which amounted to $223,429.94 at the termination of the lease, or their proceeds as and when collected, and as the lease clearly contemplates no such division, there is no justification or excuse to attempt it by further development of the case.

As already pointed out, the language of subsection (e) of the paragraph of the lease is clear and unambiguous and its meaning as expressed by the parties is plain. When a written contract expresses the intent of the par-

ties in clear and unambiguous language, the courts will not resort to construction but will give full force and effect to the instrument according to its provisions, in the absence of fraud or other grounds which affect its enforcement as provided by its terms. *Kanawha Banking and Trust Company* v. *Gilbert,* 131 W. Va. 88, 46 S. E. 2d 225; *Babcock Coal and Coke Company* v. *Brackens Creek Coal Land Company,* 128 W. Va. 676, 37 S. E. 2d 519, 163 A. L. R. 871. It is not the province of the court to alter, pervert or destroy the clear meaning and intent of the parties as plainly expressed in a written contract, or, by judicial interpretation of the instrument or otherwise, to make a new contract for them, *Kanawha Banking and Trust Company* v. *Gilbert,* 131 W. Va. 88, 46 S. E. 2d 225; *Continental Coal Company* v. *Connelsville By-Product Coal Company,* 104 W. Va. 44, 138 S. E. 737; *Griffin* v. *Fairmont Coal Company,* 59 W. Va. 480, 53 S. E. 24, 2 L. R. A., N. S., 1115; *Page* v. *Sun Insurance Office,* (CCA 8th), 74 F. 203, 33 L. R. A. 249; *Michigan Pipe Company* v. *Michigan Fire and Marine Insurance Company,* 92 Mich. 482, 52 N. W. 1070, 20 L. R. A. 277; *McQuillan* v. *Mutual Reserve Fund Life Association,* 112 Wis. 665, 87 N. W. 1069, 88 N. W. 925, 56 L. R. A. 233, 88 Am. St. Rep. 986; and full force and effect will be given to the language used by the parties when the terms of the instrument are clear and unambiguous. *Kanawha Banking and Trust Company* v. *Gilbert,* 131 W.Va. 88, 46 S.E. 2d 225; *Hanford* v. *Metropolitan Life Insurance Company,* 131 W. Va. 227, 46 S. E. 2d 777; *Adkins* v. *Aetna Life Insurance Company,* 130 W. Va. 362, 43 S. E. 2d 372; *Babcock Coal and Coke Company* v. *Brackens Creek Coal Land Company,* 128 W. Va. 676, 37 S. E. 2d 519, 163 A. L. R. 871; *Strother, Sale, Curd and St. Clair* v. *McDowell County National Bank,* 113 W. Va. 75, 166 S. E. 818; *Griffin* v. *Fairmont Coal Company,* 59 W. Va. 480, 53 S. E. 24, 2 L. R. A., N. S., 1115; *Uhl* v. *Ohio River Railroad Company,* 51 W. Va. 106, 41 S. E. 340.

For the reasons stated, I would reverse the judgment of the circuit court and hold that, under the plain and

unambiguous terms of subsection (e) of the lease, the plaintiffs are entitled to the assignment by the defendant of the full amount of the accounts receivable of $223,-429.94, and that the plaintiffs are required to assume the payment of such amount as the defendant owes for labor and supplies, not to exceed the amount paid by him on the indebtedness owing at the date of the lease, which amount is shown to be the sum of $5,050.59.

I am authorized to state that Judge Riley concurs in the views set forth in this opinion.

GIVEN, JUDGE, dissenting:

In my view there is ambiguity in the contract to be interpreted. As applied to the instant case, it appears immaterial whether the ambiguity is patent or latent. In either event the trial court was justified in interpreting the contract in the light of the situation of the parties at the time the agreement was made, the circumstances surrounding them, and any subsequent acts of the parties, relating thereto, throwing light upon their intentions in the making of the contract. *Uhl* v. *Railroad Co.*, 51 W. Va. 106, 41 S. E. 340. I think the situation of the parties and the material circumstances are fully disclosed by the record. It is not contended, of course, that the terms of a written contract can be varied by extraneous circumstances, but we should keep in mind the wide difference between the varying or changing of the terms of an agreement, and the establishment of the intentions of the parties thereto. *Stewart* v. *Steel Corporation*, 100 W. Va. 331, 130 S. E. 447; *Watson* v. *Coal Co.*, 95 W. Va. 164, 120 S. E. 390; *Clayton* v. *County Court*, 58 W. Va. 253, 52 S. E. 103.

Much stress is placed upon the word "any", used in Subsection (e), as showing that no ambiguity exists in the provision of the contract under consideration, the intention apparently being that "any" must necessarily mean "all". Of course the word may be made to mean "all" by context. In truth, the meaning of the word "any" usually depends upon context. In 32 C. J. S., Evidence, Section 961, Subsection c, the author states: "The am-

biguities existing in those cases in which the words are all sensible and have a settled meaning but consistently admit of two interpretations according to the subject matter in the contemplation of the parties have been called intermediate." The primary meaning of the word "any", as shown by Webster's International Dictionary, Second Edition, is "one indiscriminately out of a number". We can not give the word its primary meaning here, however, for the reason that the provision requires that "* * * bills or accounts * * * in an amount not less than the amount of the bills, accounts receivable, hereby assigned or to be assigned unto him, as hereinbefore recited * * *", be assigned to lessor; therefore, some other of the many meanings of the word "any" must be found. The contract under consideration does not show the aggregate amount of the accounts then owing the lessor, nor are they therein listed. Neither do we find in the record that accounts in the amount of $114,714.85, or any other amount, were ever assigned to appellee. Assuming that all of the accounts making up that sum were assigned to appellee, and that a substantial portion of those accounts was satisfied by payment to appellee, as indicated by the statement of accounts exhibited with the bill, from whence may appellee select accounts aggregating the $114,714.85? From the accounts first created, or from the newer accounts, or can we believe, as has been suggested, that it was intended that appellee return all of the uncollected portion of the accounts making up the $114,714.85, plus all unpaid accounts created during the six year period of operations under the lease, whether that amount be $124,204.83, or several million dollars? The uncertainties pointed out, I believe, clearly show the contract to be ambiguous. The word "any" must be applied to some one of the situations indicated, but to which one?

If any further demonstration of uncertainties rendering the contract ambiguous were necessary, I would simply refer to the fact that not more than two members of this Court can arrive at the same conclusion with reference thereto. I am not unmindful of the rule sometimes

applied, to the effect that the use of a common word in a peculiar sense does not make a contract ambiguous. See *In Re Milliette's Estate*, 206 N. Y. S. 342; *Kraner* v. *Halsey*, 82 Cal. 209, 22 P. 1137. We have more, in the instant case, than the use of the word "any". What is the subject matter of "any"? Is it the $114,204.83, the $124,204.83, the $223,429.74, or the $99,224.91, plus some part of one or the other of such sums. In 3 C. J. S., Ambiguity, the author, speaking of latent ambiguities, says that: "The term has been said to imply either, on the one hand, a concealment of the real meaning or intention of the writer which does not appear on the face of the words used, until these words are brought in contact with collateral facts or until the facts are shown, or, on the other hand, a clear expression of the party's intention, and the existence of a doubt not as to the intention, but as to the object to which the intention applies, and, in the latter case, the necessity of extrinsic evidence to identify the object. The term has accordingly been defined as an ambiguity raised by evidence, or that arises from the proof of facts aliunde, one which arises not upon the words of the instrument, as looked at in themselves, but upon those words when applied to the object or subject which they describe, or one which does not appear on the face of the language used or the instrument being considered, or when the words apply equally to two or more different subjects or things, as where the language employed is clear and intelligible and suggests but a single meaning, but some extrinsic fact or evidence aliunde, creates a necessity for interpretation or a choice among two or more possible meanings. The term has been held to be an equivalent of 'equivocation,' and has been distinguished from 'error,' 'mistake,' and 'patent ambiguity'." The contract being ambiguous, a court would be justified in considering what equities or inequities would result to the parties under any interpretation of the contract, in an effort to arrive at the intention of the parties. "Where possible, a reasonable and equitable construction will be given a contract; but harsh and unreasonable terms may not be ignored or changed by the

court contrary to the clear meaning of the language used and the intent of the parties." 17 C. J. S., Contracts, Section 319. See *Engineering Co.* v. *County Court,* 92 W. Va. 368, 115 S. E. 462; *Seward* v. *Hardware Co.,* 161 Va. 610, 171 S. E. 650.

"Unless intention of parties to contract is manifest by language employed, subject-matter, and surrounding circumstances, that construction should be given which is consistent with the right of the case." *Telephone Co.* v. *Telephone Co.,* 142 Va. 529, 129 S. E. 389. The trial court merely applied these principles in its effort to determine the true meaning and intent of the language contained in Subsection (e) of Section 12 of the contract. In so doing, that court did not necessarily forget the principles relating to interpretation of contracts, and disposed of the matter entirely upon equitable principles. So viewing the question, I can not say that his interpretation is wrong. At least not more than two members of this Court can agree that he erred as to any principle of law. In addition to having the parties before him, in being permitted to consider the situation of the parties and the circumstances surrounding them, resultant equities and inequities that would possibly arise under any interpretation of the contract, as above indicated, he could look to each and all of the provisions of the contract. From these provisions he would find that the parties contracted with reference to furniture and other personal property in the hospital, with reference to taxes and other assessments, with reference to repairs to the hospital building, with reference to alterations of that building, with reference to insurance, with reference to inventories, from all of which he would certainly discover that the intention of the parties as to such matters was that, upon the termination of the lease, the parties be placed in as nearly the same position as they were at the beginning of the lease. Could this not be considered in determining their intentions with reference to the accounts receivable and the accounts payable? The result reached by the trial court as to the accounts receivable and the accounts pay-

able was to the same practical effect as the results reached by the parties in the contract as to such other matters.

I do not think that we should make a fetish of the word "any" and rely on it as solving the problem presented by this record. Nor should we give literal meaning to a group of ambiguous words which would result in inequitable or unconscionable disposition of this controversy. I think it is better to arrive at a fair and equitable result upon the theory that the parties to the lease here considered did not intend to take from each other any right or rights which in all fairness belong to the other. I think that the Circuit Court of Mingo County has given effect to the intention of the parties as nearly as could be done, in the circumstances disclosed by this record.

It will be noticed that the syllabus prepared by Judge Fox, and concurred in by Judges Haymond and Riley, remands the case for "consideration" only. Therefore, I presume there can be no further development of the case as it relates to interpretation of the contract. "Consideration" alone may be given it by the trial court. Not more than two members of this Court are able to agree upon any proposition of law or fact which should be considered again by the trial court. I have been unable to find any precedent or reason for reversal of the decree of the trial court in such circumstances. The record shows that the trial court fully and carefully considered every phase of the matter involved. His views were clearly expressed in a written opinion. The judgment entered is in accord with those views. Inasmuch as not more than two members of this Court can say that the trial court erred as to any principle of law, I would affirm that judgment. This Court should not expect the trial court to discover some mystic formula for solving a problem that we are unable to solve.

Being of the views indicated, I respectfully dissent. I am authorized to say that Judge Lovins concurs in the views expressed herein.